CHASTAIN v. COOPER & REED et al.
No. 14454.

Court of Civil Appeals of Texas.
Dallas.

June 20, 1952.

Rehearing Denied July 25, 1952.

Jack T. Life, Athens, for appellant.

Bowyer, Gray, Thomas & Crozier, and Locke, Locke & Purnell, all of Dallas, Lasseter, Spruiell, Lowry, Potter & Lasater, of Tyler, Bryan, Stone, Agerton & Parker, of Fort Worth, and Harvey P. Shead, of Longview, for appellees.

CRAMER, Justice.

This is a rather complicated lawsuit involving a number of controversies growing out of the drilling of a well for oil and gas in what is known as Tri-Cities Field in Henderson County, Texas, and the failure of Humphrey Marshall to pay the drilling contractor and numerous other parties who furnished materials or performed work on said well. Numerous affidavits for liens were filed by parties who either intervened or were made parties-defendant. Whiteley-Phillips Drilling Company claimed under both an oral agreement with M. B. Chastain and a written contract with Marshall for the drilling of the well. Cooper & Reed and National Supply Company claimed their indebtedness was contracted directly by Chastain through his agent, George Mitch-

am. Upon application of John W. Murchison, an intervener, R. B. Sanders was appointed receiver and the property has been, since such appointment, operated by such receiver. By agreement, Murchison's plea of intervention was admitted by all parties and judgment entered awarding him recovery, as against all parties, of the leasehold estate on the lands covered by the leases, except the 173 acres embracing the well, and established his interest in an overriding ⅛ royalty in such 173-acre tract. The trial was to the court without a jury and resulted in a judgment in favor of Whiteley-Phillips against Chastain and Marshall for a portion of the claim, and against Marshall individually for the remainder. Cooper & Reed and the National Supply Company recovered judgment against Marshall and Chastain for the full amount of their claims plus attorney's fees. National Supply's lien was foreclosed and Cooper & Reed were denied a lien. I. S. Dolan recovered a money judgment against Marshall and a foreclosure of a lien, securing the debt, against the lease. In addition to the above, judgment was entered against Marshall for a money judgment in favor of all parties claiming against him, from which parts of the judgment no appeal was taken.

Chastain has duly perfected this appeal and briefs 91 points of error.

The transcript contains 338 pages, the statement of facts 861 pages, and appellant's brief 182 pages.

The record, material to all claims by all appellees, is substantially as follows: The base lease was dated June 20, 1948 with Patricia Ann Murchison, a feme sole, as lessor and John W. Murchison as lessee, and covered 482.03 acres of land. On August 17, 1948 John W. Murchison assigned said lease to Chastain, excepting therefrom an overriding royalty to himself of ⅛ of ⅞ of all the oil, gas and other minerals produced and saved from said land. In the assignment to Chastain he bound himself, his heirs and assigns, to commence operations for the drilling of a well for oil and gas within 30 days from date of the assignment, and to prosecute the same with due diligence to a depth of 7,800 feet

unless oil and/or gas should be found in paying quantities at a lesser depth. It provided for an automatic reversion of title upon grantee's failure to comply with such provision. On August 19, 1948 Chastain, by written assignment, transferred to Marshall three tracts of the land theretofore transferred to him by Murchison, excepting from such assignment and reserving to himself an interest in the amount of $\frac{9}{32}$ of all the oil, gas and other minerals produced and saved from the land, $\frac{4}{32}$ of $\frac{7}{8}$ to be an overriding royalty, and $\frac{5}{32}$ of $\frac{7}{8}$ to be a working interest; the overriding royalty to be free and clear of all costs and expenses except ad valorem and severance taxes assessed against such interest; the working interest to be free and clear of all costs of drilling, equipping, and completing into tanks on the first well only, but to bear its proportionate part of costs of drilling and completing into tanks on all subsequent wells. On November 9, 1948 Chastain assigned to H. P. Barton, subject to the full effect of the assignment to Chastain, a $\frac{1}{32}$ of the $\frac{7}{8}$ working interest, free and clear of all expense of completing the first well, but to bear its proportionate part of expenses of other wells. Marshall, after Chastain's assignment to him, made numerous assignments out of his interest, of undivided working interests, to others, not parties to this suit. After he was served with process in this suit, Marshall left for parts unknown and was not present or represented at the trial.

Chastain defended all the claims asserted against him on the ground that he had assigned the lease to Marshall, reserving only a $\frac{5}{32}$ of $\frac{7}{8}$ interest free of drilling costs on the first well, and a $\frac{1}{8}$ of $\frac{7}{8}$ overriding royalty; that Marshall was obligated to drill the first well free of cost to him; that his connection with the drilling of the well and purchase of equipment was only for the purpose of assisting Marshall; that he was not a partner of, nor obligated for, or with, Marshall, for any of the costs of drilling the well.

Whiteley-Phillips, National Supply Company, and Cooper & Reed claimed Chastain personally contracted their obligations; that drilling operations were commenced on or about September 13 or 14, prior to the registration of Marshall's assignments, at a time when Chastain was the record owner and in charge of the conduct of the drilling operations; and that Chastain and Marshall were actually engaged in a joint enterprise and were partners.

We will consider all of Chastain's assignments with reference to the claim of Whiteley-Phillips together. They are in substance: There was no evidence to sustain the findings (1–2) that there was an oral contract between Whiteley-Phillips and Chastain for the drilling of the well under which Chastain moved on the lease; (3) that the parties did not mention Marshall, and Chastain represented that he owned the lease; (4) that thereafter Whiteley-Phillips commenced drilling operations.

The trial court erred in refusing to find (5) that it was contemplated by the parties that the drilling contract would be in writing; (6) that the written contract dated September 20, 1948 between Marshall and Whiteley-Phillips was the only contract made for the drilling of the well; (7) and that there was never an oral contract for the drilling of the well.

(8) The court erred in finding that at the time Marshall signed the contract with Whiteley-Phillips agreeing to pay for all drilling operations, Whiteley-Phillips did not release Chastain; (9) that after Whiteley-Phillips received the October 28, 1948 letter, they prepared a contract to be signed by Chastain, Marshall, and Whiteley-Phillips on substantially the same terms as the oral contract, which contract Chastain refused to sign; and that Ellison Miles, for Whiteley-Phillips, did not agree to release Chastain from his prior obligations under the oral contract, but continued to claim that Chastain was liable thereunder; (10) that when Chastain's name was marked out of the contract, and there was noted thereon, "All strike-outs of the name, M. B. Chastain, are approved," it was not Whiteley-Phillips' or Marshall's intention that Chastain should be released on his oral agreement; (11) Marshall's attorney explained that the notation was to show that the change therein was made to avoid suspicion and not with the intention on the

part of Whiteley-Phillips to release Chastain; (12) that never at any time was there an agreement or intention on the part of Whiteley-Phillips to release Chastain, or that there should be a novation of the oral contract.

That the court erred in refusing to find: (13) That if there ever was an oral contract between Chastain and Whiteley-Phillips, Chastain was released when Whiteley-Phillips agreed to take Warren Wright on the contract; and (14) thereafter agreed to take Marshall instead of Wright and to leave Wright off; (15) that if Chastain ever made an oral agreement, the written contract was a novation thereof and Chastain was released thereby.

(16) The court erred in permitting the witness Miles, a stockholder and vice president of Whiteley-Phillips, to testify over Chastain's objection that when he and Marshall signed the written drilling contract, he told Marshall that he had visited Chastain and at Chastain's request he was taking the contract from Marshall, but that they did not, in taking the contract from Marshall, release Chastain under his oral contract, since such declaration was out of the presence of Chastain and was a self-serving declaration.

Error of the court in finding: (17) That at the request of Chastain or his agent, Whiteley-Phillips moved to a second location designated by Chastain; and (18) Chastain was liable for the reasonable cost of such move; and (19) that it should be implied that Chastain agreed to pay the reasonable cost thereof.

(20) The judgment below should be reversed because Whiteley-Phillips was estopped to claim that Chastain is liable to it, and to deny a novation of the drilling contract between it and Marshall.

(21–22) Error in finding that the assignment from Murchison to Chastain obligated Chastain to commence drilling within 30 days, the assignment only obligating him to commence operations for the drilling of the well within 30 days; and in refusing to find that the assignment only obligated Chastain to so commence operations within 30 days.

(23–24) Error in finding that the assignment from Chastain to Marshall reserved ⅛ of ⅞ overriding royalty and ⁵⁄₃₂ of ⅞ royalty free of cost of drilling the first well, only, to a depth of 7,800 feet, and in not finding such reservation was an overriding royalty of ⅛ of ⅞ and a ⁵⁄₃₂ of ⅞ working interest free and clear of all cost of drilling, equipping, and completing into tanks of such first well.

(25) Error of the court in finding that prior to the transaction here involved, Chastain had engaged in two other transactions with Marshall, in the same field, and in each instance, after acquiring the leases, had made assignments to Marshall, reserving an interest free of cost of drilling the first well, with Marshall obligated to drill each of said wells; and thereafter, each time, Marshall proceeded to promote the sale of small interests to parties in other states in order to raise the cost of drilling, and in each instance Marshall, as soon as drilling was completed, turned the operation of the well back to Chastain, who has continued to operate them down to the time of the trial; that the only difference in the prior transactions and the one here was that here, after the sales of interests to outsiders, Marshall left and failed to pay the drilling costs and has not turned the operation over to Chastain; and (26) that Chastain continued to participate and incur obligations after the date of assignments to Marshall; (27) after August 19, 1948 Chastain employed the county surveyor to make a location for the well in question.

(28) Error of the court in refusing to find that in his trade with Marshall, Chastain agreed to obtain a drilling permit and to survey the location.

(29) Error in the court's finding that Chastain applied to the Railroad Commission for a permit to drill a well and designated it in the application as the "Chastain-Murchison lease" after the "purported assignment to Marshall"; and (30) that Chastain's letter of October 28, 1948 to Whiteley-Phillips strongly indicated that up to that time Chastain had treated the operation as his own and had not notified

Whitely-Phillips that Marshall was in any way obligated for it.

(31) Error of the court in refusing to find that prior to September 22, 1948, Whiteley and Miles, for Whiteley-Phillips, began negotiating with Chastain to drill the well involved here, and were informed by Chastain that he was not going to drill the well, but had made a trade with Marshall to take over the leases and drill the well,—he to retain only a small interest; and that Marshall had had some character of deal with Warren Wright to drill the well for a part of Marshall's interest; and (32) that in the negotiations between Whiteley-Phillips and Chastain, Chastain was to negotiate the contract for Whitely-Phillips with Wright to drill the well at $6.50 per foot, from which Whiteley-Phillips was to pay Chastain 50 cents per foot as commission; and that (33) under date 9/20/48, Whiteley-Phillips prepared a written contract to drill the well for Wright; and (34) on 9/21/48, wrote Chastain "Confirming our agreement on the Warren Wright contract, Henderson County, Texas, we will pay you Fifty cents (50¢) per foot at completion of this well"; and (35) Whiteley-Phillips commenced work on 9/22/48, expecting to make a contract with Wright; and (36) the deal then pending between Marshall and Wright for the drilling of the well was not completed because of certain title requirements; and (37) in October Chastain learned that the Whiteley-Phillips deal had fallen through, and he had his office manager, Rembert, to contact Whiteley-Phillips; and (38) advised him of the change, and by letter of October 28, 1948, requested Whiteley-Phillips to write a new contract for Marshall, leaving Wright off; and (39) that Chastain had been Whiteley-Phillips' agent in negotiating the Wright contract.

(40) Error of the court in finding that "After the oral contract between M. B. Chastain and Whiteley-Phillips Drilling Company had been entered into Chastain advised Whiteley-Phillips that he had made a deal with Warren Wright to drill the well and requested that Whiteley-Phillips enter into a contract with him for the drilling of the well at the rate of $6.50 per foot. The oral contract between Chastain and Whiteley-Phillips had called for drilling at the rate of $6.00 per foot and because of this Chastain asked that the extra 50¢ per foot be rebated to him. This was a rebate and not a commission. Chastain was acting for his own interests in the Warren Wright matter, not as a representative of Whiteley-Phillips. The Warren Wright negotiations never matured and no contract was ever entered into with Warren Wright. Chastain conducted all negotiations with Whiteley-Phillips concerning the Warren Wright transaction on the basis that it was Chastain's well and without disclosing the alleged interest of Humphrey Marshall"; (41) that if there was an oral agreement it was repudiated in the conversation of October 27, 1948.

(42) And in finding that "The Court declines to find that Chastain (or his agent Rembert) repudiated this contract on October 27, 1948, in the telephone conversation referred to in said letter. Evidence as to what was said in this conversation is not sufficiently definite and certain to support such a repudiation, and the court finds, therefore, that the repudiation did not come until the said letter was actually received by Whiteley-Phillips".

(43) Error in refusing to find that the well had been drilled to a depth of 5,091 feet on October 27, 1948.

(44) Error in finding that on November 9, 1948, when Chastain declined to sign the written contract, the well had been drilled to a depth of 6,675 feet, since such depth was not reached until midnight, November 9, 1948.

(45) Error in the entry of the judgment for Whiteley-Phillips against Chastain jointly and severally with Marshall for $41,826.15 plus interest, costs, etc.

(73) Error in finding that the total amount of Whiteley-Phillips' recovery of $87,832.52 was secured by a valid contractor's lien against the oil and gas leasehold estate and that the date of inception of such lien was September 13, 1948.

(74) Error in awarding a lien in favor of Whiteley-Phillips against Chastain's interest in the oil and gas lease for the

full amount of its judgment, it being undisputed that Whiteley-Phillips did not perfect its lien against the interest of Chastain; and (89) in not finding that there was no mining partnership between the parties in the development of the leases; and (90) no partnership between Chastain and Marshall in the drilling of the well in question.

Although the points and counterpoints are numerous, they raise but three general material fact issues, to wit: (1) Was there a binding oral agreement between Chastain and Whiteley-Phillips under which Whiteley-Phillips was to drill the well in question for Chastain, and, if so, did Whiteley-Phillips actually begin and proceed to drill such well under such oral agreement? (2) If there was such an oral agreement under which Whiteley-Phillips began the drilling of such well, did the facts and circumstances surrounding the execution of such written contract between Whiteley-Phillips and Marshall effect a novation of the oral contract? (3) If a novation was not affected, how deep had the well been drilled at the time the written contract took effect?

We will, in passing on all the assignments, consider them in groups as indicated above, and since the attack made by most of the assignments is that there is no evidence to sustain the court's findings, and not that such findings are against the preponderance of the evidence, we will consider, in passing upon such assignments, only that evidence which is favorable to the findings on the issue or issues being discussed and passed upon.

On the question of whether or not there was an original oral contract, Chastain testified that he had, prior to the negotiations in connection with the present controversy, farmed out two or three prior deals to Marshall in the same field where he had assigned his lease to Marshall, reserving a fractional royalty and/or working interest in the first well, with the requirement that Marshall drill the wells and complete them into tanks free of cost to Chastain; that in each of such prior transactions Marshall then proceeded to sell small interests to various outside par-

ties and, when the first well was completed, by an additional contract with Marshall, he, Chastain, thereafter in each transaction became the contract-operator of the well for the various owners, and also stated that he didn't think Marshall could run a producing lease.

The record further shows that in connection with the present well, Chastain was instrumental in securing Ben Wathen, County Surveyor of Henderson County, to make a survey and stake the location of the well, and that Chastain in applying to the Railroad Commission for permit to drill the well (the permit was applied for after Chastain executed his assignment to Marshall) did so in the name of M. B. Chastain et al., naming the lease the "Chastain-Murchison Lease," but explained that " * * * We often do that when we have an override, we take out the permit in our name." The location was staked by Wathen in August 1948 and the permit was obtained in the same month. Vernon Whiteley, of Whiteley-Phillips, testified that at the time Chastain employed him, orally, to drill the well at $6 per foot plus extras, there was nothing said about anybody being responsible for drilling costs except Chastain. Later he called Chastain by phone and in that conversation told Chastain he could not furnish the casing, and about three days later Chastain called him by phone and asked him to move on the job as soon as he could; that he, Chastain, was having the pits dug. The first entry on the log of the well was September 22, 1948. He further testified that the first time he heard about Warren Wright was through Chastain, who told him he wanted to change the contract "and make it out for Mr. Warren Wright at $6.50 a foot to him and give him a letter giving the other 50 cents back to Mr. Chastain at the completion of the job." The record shows that Whiteley-Phillips thereafter gave Chastain a letter covering the 50 cents per foot to him. It is undisputed that Whiteley-Phillips at that time agreed to take Warren Wright on the drilling contract, Whiteley testifying that Wright was a wealthy man. It is also undisputed that the Warren Wright deal

with Chastain fell through and thereafter a written contract was prepared by Whiteley-Phillips naming Chastain and Marshall as the parties contracting to have the well drilled. It is also undisputed that Chastain refused to sign the contract and thereafter his name was stricken out of the contract by marks drawn through his name in each place it appeared therein. The contract was dated September 20, 1948, and invoices for payment of compensation under the contract were billed by Whiteley-Phillips on November 30, December 15, 1948 and January 6, and February 21, 1949, the bills being made out to Marshall alone; and that such invoices were attached to and made a part of the affidavit for mechanics' and materialmen's liens against the wells involved (such affidavit also naming Marshall alone as obligor) and filed in the office of the County Clerk of Henderson County at 8:00 A.M. on March 31, 1949.

The witness Rembert, Chastain's office manager, testified that he had not until October 27 or 28, 1948, put any representative of Whiteley-Phillips in contact with Marshall, but that he did not know whether or not, before that time, Chastain had put Whiteley-Phillips in contact with Marshall.

On October 28, 1948, Rembert wrote Whiteley-Phillips Drilling Company at Tyler, Texas: "Attention: Mr. Whiteley" —as follows:

"With reference to our telephone conversation of yesterday, this letter will confirm the following:

"Mr. Humphrey Marshall has decided to pay for the cost of drilling the Murchison No. 1 well, Tri-Cities Field, Henderson County, Texas. Please write a new contract on same, leaving Mr. Warren Wright off and make for Mr. Marshall's signature.

"This contract should be for $6.00 per ft. and you can disregard your letter of September 21, 1948, concerning the 50¢ per foot rebate on the Warren Wright Drilling Contract.

"Mr. Marshall's address is 817 Mercantile Bank Building, Dallas, Texas. However, this contract should be handled through Mr. Bill Campbell,

who is Mr. Marshall's attorney there in Dallas. I do not have his address but you can get same by calling Mr. Marshall's office. His number is Riverside—6761. Your prompt attention to the above will be appreciated."

A. O. Phillips, President of Whiteley-Phillips, testified as to the telephone conversations as follows:

"Yes, sir, Mr. Chastain said that he had made this deal with Warren Wright for fifty cents a foot more than he had with us and asked me if that would be all right to cut the fifty cents back to him. I told him that would be all right. Q. Was there anything said with reference to a letter? A. He wanted me to confirm his fifty cents by letter and send him the contract and he would finish the negotiations with Warren Wright."

In Whiteley-Phillips' brief it is stated, with reference to such telephone conversations, as follows:

"After this telephone conversation Phillips had the contract drawn and forwarded it to Chastain. This contract was forwarded with a letter to Chastain stating that it was 'in connection with our agreement to drill *your well* in Henderson County, Texas.' At the same time Phillips, by letter, confirmed his agreement to pay to Chastain the fifty cents per foot at the completion of the well. This was the 50 cents per foot which Chastain was entitled to receive because he had induced Wright to pay $6.50 per foot, whereas Whiteley-Phillips had already agreed with Chastain to drill it for $6.00 per foot."

They also, in their brief, quote and comment on Chastain's evidence as follows:

" 'Q. You didn't know why in the world Whiteley-Phillips went out there and were doing it? A. No, we told them when they came over, that it was for Warren Wright, that Humphrey Marshall was working out the deal with Warren Wright.

" 'Q. Were you to communicate with Mr. Whiteley and tell him when

to start drilling, when you were speaking for Warren Wright now? A. I don't remember what we were supposed to do.

"'Q. When you were discussing the Warren Wright contract with Mr. Whiteley, as you say you told him you would let him know when to start, didn't you? A. He called me back two or three times.

"'Q. On one of those telephone calls you told him to get out there and start work? A. For Warren Wright.'

"It appeared clearly to be true, however, that Whiteley-Phillips were already moving in and rigging up before Warren Wright was mentioned in the deal. Whiteley-Phillips never talked to anyone but Chastain in the Warren Wright negotiations and though Chastain must have known that Warren Wright had never signed the contract, he wrote Cooper & Reed that he would see to it that Warren Wright paid them for building the roads and digging the pits. Whiteley-Phillips were already drilling at the time the Warren Wright negotiations started. The most reasonable conclusion to be drawn from these facts is the one that was drawn by the trial court,—that Chastain, after employing Whiteley-Phillips to drill the well, started negotiations with Warren Wright to assign him an interest in the property in return for which Warren Wright would agree to pay the drilling obligation. It was understood that if the Warren Wright contract were completed, it would cover the same thing Chastain had already agreed to except that Chastain would make a profit of 50¢ per foot in the transaction."

The witness Miles, Vice President of Whiteley-Phillips, testified that the reason the Warren Wright contract was dated back to September 20, 1948 was that Chastain said it was his deal with Warren Wright.

■ In view of the above record, we conclude that the evidence raised the questions of fact as found by the court on the question of an oral contract to drill the well, and that Whiteley-Phillips commenced the drilling of the well under such oral contract; therefore all of appellant Chastain's points questioning such findings are overruled.

We will next consider all points raising issues on the asserted novation of the oral contract by the execution of the written contract.

■ Novation is a mode of extinguishing one obligation by another,—a substitution, not of a new paper, but of a new obligation in lieu of an old one—the effect of which is to discharge the old obligation and the acceptance of the new obligation in its place. Each element of novation must be proven, and of course it is only where there is no doubt as to the terms of the agreement that it becomes a question of law.

After Whiteley-Phillips agreed to accept Warren Wright in lieu of Chastain on the drilling contract, a written contract was to be executed by Warren Wright. It is undisputed that Whiteley-Phillips, after Marshall's name came into the deal, knew that Marshall was to be substituted for Warren Wright, and demurred to such agreement by preparing the written drilling contract for both Chastain and Marshall to sign. Chastain then refused to sign the written drilling contract prepared for him and thereafter Whiteley-Phillips struck out the name of Chastain and executed the contract for the drilling of the well with Marshall alone. The drilling contract was dated September 20, 1948, and Marshall alone signed it with Whiteley-Phillips Drilling Company. Whiteley-Phillips then proceeded to go forward with the drilling of that well under the written contract. Under such undisputed facts, liability of Chastain for the drilling of the well became a question of law, not a question of fact for the trier of the facts.

■ In our opinion the evidence above justified but one conclusion, and that is that, as a matter of law, Whiteley-Phillips, when they accepted the written contract with Marshall, dated September 20, 1948, and Chastain's name was marked out in every place it appeared therein, there was, as a matter of law, a novation of contract.

Every element was present, to wit: (1) Existence of the prior valid obligation of Chastain to Whiteley-Phillips; (2) the agreement of the parties to a new contract; (3) which was a valid contract; (4) the extinguishment of the old contract by the substitution of the new valid contract.

Novation being complete, there was no longer a valid obligation of Chastain to Whiteley-Phillips under the old oral contract, and since there was no liability of Chastain under the written contract dated back to a time before the beginning of the drilling of the well, we must sustain all points asserting a novation of the original oral contract by the substitution of the new written contract. Such holdings make other points by Chastain and Whiteley-Phillips immaterial. However we have fully considered them and find no merit in them and they are overruled without further comment.

Under the above holdings, the judgment below as between Chastain and Whiteley-Phillips Drilling Company must be reversed and judgment here rendered that Whiteley-Phillips recover nothing against M. B. Chastain.

We will next consider appellant's points 46 to 60 inclusive and point 75, which involve the National Supply Company's claim and judgment against Chastain. Such points are in substance: (46) Error of the court in finding that Mitcham was the agent and employee of Chastain on the well involved in this suit and had authority to make purchases of material or equipment, or to employ labor for the account of, or on behalf of, Chastain in connection with the drilling of the well in this suit; (47) in not finding that Mitcham was never employed by Chastain to do any character of work on the well in question.

Error in finding (48) that Mitcham was employed by Chastain in 1946 and has continuously worked for him since that time in the capacity of a switcher; (49) the duties of a switcher are to turn the wells on and off, flow the tanks, keep the lease clean, and make daily reports to the operator of the lease; and such duties were Mitcham's only duties on the lease,— not the one involved here, but another lease owned by Chastain; (50) that Mitcham was not a general agent or representative of Chastain; (51) that Mitcham had only the limited authority of a switcher; and (52) as a switcher, Mitcham had no authority to purchase equipment or materials, or to contract for the building of roads or the digging of slush pits in connection with the drilling of the well in question.

Error of the court in refusing to find (53) that Mitcham was employed by Marshall in connection with any duties he performed on the well in question; and (54) in rendering judgment against Chastain jointly with Marshall for $2,176.13 and in finding (55) that Mitcham was authorized by Chastain to purchase from National Supply Company and charge to him (Chastain) the christmas tree connections and line pipe used in the well; (56) that Chastain was estopped to deny Mitcham's authority; (57) that National Supply sold to Chastain in the christmas tree connections, etc.; (58) that the purchase was negotiated by Mitcham as agent of Chastain acting under actual authorized authority, and apparent authority; (59) that if there were any limitations on Mitcham's authority, they were secret.

The court erred in refusing to make Chastain's requested finding (60) that Mitcham was not authorized to purchase the christmas tree connections, etc., from National Supply for Chastain's account and did not have authority to do so; and (75) in awarding National Supply a materialman's lien on Chastain's interest in the lease.

The evidence relied upon by National Supply Company (in their brief) was in substance that from 1946 until time of the trial, Mitcham was in the employ of Chastain, was his personal employee in the Tri-Cities Field and had one employee under him. His duties were to look after the interests of Chastain in the field and in connection with Chastain's properties, and to purchase supplies, run such properties, and to fully look after his interests. For several years National Supply had been doing business with Chastain, and Mitcham had purchased supplies from them to be used on Chastain's properties. National

Supply's salesman, N. S. Shipman, had made sales to Chastain through Mitcham. On two other leases in the same field Mitcham had, on behalf of Chastain, employed Cooper & Reed to dig pits, clear locations, etc. Mitcham testified that his duties with Chastain were to run his lease and see that they operated and produced oil. He was on the location of the well practically every day from the time it started, "about a third of the time, maybe." Ben Wathen, surveyor who made the location of the well, made it for Chastain at the request of Mitcham. E. M. Finley, with Whiteley-Phillips, testified he knew Mitcham only as working for Chastain. Mitcham went out with Finley to stake the location, was present with Rembert when the surface casing was set, and that Mitcham gave permission to use gas from another of Chastain's wells in connection with the drilling of the well in question here. Shipman, salesman for National Supply, made efforts to sell supplies to Chastain by contacting Mitcham, and that Marshall was unknown to him (Shipman). National Supply had never done business with Marshall and had theretofore checked its records and concluded not to sell Marshall anything. The sales slips were made out in the name of M. B. Chastain as purchaser and Shipman took them to Mitcham's home in Athens, where Mitcham signed them (Shipman in other testimony fixed the date of such signing of the sales slips as ———). Shipman also received an order, later at the well, from Mitcham for other materials which he also wrote up and charged to Chastain; nobody else's name was mentioned. He had at this later date heard of Marshall, but had not seen him, knew nothing about him, and had never sold him anything. He also testified the order blank was not signed by or for Chastain, but a Mr. Haslett signed the receipt for the material delivered. Mr. Mitcham told him they would pick it up.

Mitcham testified that he signed some of the purchase orders, but if he "had known it would have been Mr. Chastain, I wouldn't have signed them." That he had instructions not to sign anything billed to M. B. Chastain; he did not remember anybody's name being mentioned; "If I didn't tell him to charge it to Mr. Marshall, I didn't tell him to charge it to anybody."

Chastain testified that nobody for him ever notified National Supply of any limitation on the authority of Mitcham, or what authority Mitcham had, or did not have. He "didn't think it was necessary."

National Supply seeks to sustain its claim against Chastain based on the apparent authority of Mitcham; citing 2 Am.Jur. 86, sec. 104; 2 Am.Jur. 88, sec. 105; Art. 2226, Vernon's Ann.Civ.St.; Freeman v. W. B. Walker & Sons, Tex.Com.App., 212 S.W. 637. And as to its lien on the lease, Oriental Hotel Co. v. Griffiths, 88 Tex. 574, 33 S.W. 652, 30 L.R.A. 765. It is undisputed in the record that Mitcham was employed by Chastain only as a switcher on his leases, and in connection with the leases involved in this suit, with Chastain's permission, worked for Marshall.

■ Even though the evidence of Chastain and his witnesses directly contradicts the evidence of the witnesses for National Supply, the circumstances in this record, in our opinion, in so far as National Supply is concerned, raised the issue of the apparent authority of Mitcham; and therefore we must, under the authorities cited by National Supply, hold that there was sufficient evidence to raise the issue of such apparent authority of Mitcham as to bind Chastain in connection therewith. Appellant's points 46 to 60 and point 75 are overruled.

■ Points 61 to 69 inclusive relate to the claim of Cooper & Reed for $1,310 plus $250 attorney's fees, etc. These points in substance are: The court erred (61) in awarding Cooper & Reed judgment for $1,560, interest, costs, etc.; (62) in finding that Mitcham was Chastain's representative and that Chastain affirmed his act in employing Cooper & Reed to dig the pits, etc.; (63) in finding that Mitcham purported to act as agent for Chastain in employing Cooper & Reed; (64) in finding that on September 27, 1948, while the pits were being dug and after Cooper & Reed had billed Chastain for the work to that time, Chastain requested that the bills be sub-

mitted to Warren Wright; (65) in finding that for an extended period Mitcham had been in charge of various wells and leases owned by Chastain in the Tri-Cities area, with general authority therein; (66) in finding that Cooper & Reed relied on the general authority as extended to Mitcham, and on the letter that he would see to it that the bills were paid, as evidencing Mitcham's authority to contract their indebtedness; (67) in finding that Mitcham duly authorized the debt of Cooper & Reed on actual authority of Chastain and by apparent authority relied upon by Cooper & Reed; (68) in finding that if there were any limitations on Mitcham's authority, they were secret and Chastain should be estopped to deny Mitcham's apparent authority; and (69) in refusing Cooper & Reed's request to find that Mitcham was not authorized by his employer Chastain to employ Cooper & Reed to dig the slush pits and roads on the lease involved in September 1948.

Chastain in his reply adopted the statements made under his points 46 to 52 inclusive and 53 to 60 inclusive, and added that Cooper & Reed, in its present suit, also sued Warren Wright and Humphrey Marshall jointly with him. The record here shows that the account of Cooper & Reed was billed to Warren Wright, c/o M. B. Chastain, after they received a letter from Chastain by W. E. Rembert, office manager, to bill them that way. The letter contained the following: "Mr. Chastain will see that the bill is paid." This letter had noted thereon in pencil, by Cooper & Reed, "9/28/48. Mr. ——— Please invoice Mr. Warren Wright for the tickets you have on Mr. Chastain for last week, on bank of Malakoff well. ———." The evidence also shows that beginning October 3, 1948 the invoices were thereafter made out to Humphrey Marshall on instructions from Mitcham. Cooper also testified that Chastain would not pay these bills and that he relied on the letter of September 27 that Chastain would see that the bills were paid. Such evidence, although seriously controverted, was sufficient to sustain the court's finding in favor of Cooper & Reed, and therefore points 61 to 69 are overruled.

Points 70, 71 and 72 assert that there is no evidence of what was a reasonable attorney's fee to support the several judgments against Chastain for attorney's fees. The court had all the evidence of what legal services were performed. It was not absolutely necessary that there be testimony, by attorneys, as to what would be a reasonable fee, since the trial court judicially knows the value of an attorney's services in connection with the trial of a case before him. Johnson v. Blanks, 68 Tex. 495, 4 S.W. 557; and Moore v. Moore, Tex.Civ.App., 192 S.W.2d 929, syls. 9, 10. Under such circumstances the judgment is not subject to the attack made thereon. Points 70 to 72 are overruled.

Points 73 to 85 inclusive relate the liens against the interest of Marshall, if any, in the lease. Such points, however, are not briefed by Marshall, and Chastain is not interested therein since they only attack a lien against Marshall's interest, if any, in the wells.

Points 86 to 88 inclusive complain of error in the finding that Chastain was not entitled to a lien securing his judgment against Marshall, he having filed a lien within the time and in the manner required by law. The record shows Chastain's assertions to be correct, and they are sustained without further discussion.

Points 89 and 90 complain of the court's failure to sustain his request to find that there was "no mining partnership" and no partnership between Chastain and Marshall in the drilling of the well in question. We sustain this contention based on the record as a whole. The judgment of the court did not in any way conflict with a finding of no partnership or no mining partnership, and did not depend thereon. Points 89 and 90 are sustained.

Point 91 is as follows:

"The error committed by the court in the complicated manner in which it directed the receiver to disburse the proceeds of the sale of the property involved and oil runs, such method being impossible of performance and contrary to law."

In view of our disposition of the other points as above set out, we sustain this point and set aside and reverse such portion of the judgment with directions to the trial court to dispose of such sums in such manner as to carry into effect the judgment as modified by our holdings in this opinion.

The judgment below is reversed in part, and rendered in part, and in part affirmed in conformity with above opinion.