**BARREDA v. CRAIG, THOMPSON & JEFFRIES. (No. 156-3127.)**

(Commission of Appeals of Texas, Section B. May 26, 1920.)

1. Evidence ⬤⟿445(2) — Written contract of sale could not be modified as to price by parol.

In absence of allegation of fraud by the seller of cattle in procuring the written contract at a specified price by representation that his influence with the Mexican government would enable the cattle to escape export duty, plea of the buyers, setting up a verbal modification of the contract for the deduction from the price per head of the export duty exacted by the Mexican government, *held* not available to them as a palpable attempt to ingraft on a written contract a parol agreement directly antagonistic to it.

2. Sales ⬤⟿61—Contract for sale of Mexican cattle to Americans held executed as to seller.

Where American buyers of Mexican cattle accepted them from the seller, and moved them to a point in Mexico near the United States line, where nothing remained to be done except to pay duty, if legally imposed, drive the cattle to the American side, and pay the Mexican seller in accordance with the contract, so far as the seller was concerned, the contract was executed, and not open to abrogation as executory, to permit making of a new agreement.

3. Sales ⬤⟿89—Substituted agreement, diminishing price, not enforceable, as exacted from seller.

Where American buyers of Mexican cattle, after they had accepted and driven the cattle to a point in Mexico for export to the United States, insisted they would not take the cattle unless seller reduced price by amount of what buyers claimed was the Mexican head duty, substituted agreement, embodying modification, cannot be set up by buyers against seller's action for undiminished price, having been exacted by coercion, in view of the danger of seizure of the cattle by revolutionists and other factors.

4. Sales ⬤⟿89—Seller, who reduced price, could recover amount on failure of consideration for reduction.

Where the Mexican seller of cattle to Americans reduced the price to the buyers solely in consideration of an export duty claimed by them to be levied by the Mexican government, which duty was in fact not levied, the sole consideration for the reduction of price, embodied in a substituted agreement, failed, and the seller can recover the amount of the reduction.

Error to Court of Civil Appeals of Fourth Supreme Judicial District.

Suit by Ramon Barreda against Craig, Thompson & Jeffries. To review a judgment for plaintiff, defendants brought error to the Court of Civil Appeals, which reversed the judgment and remanded the cause (200 S. W. 868), and plaintiff brings error. Judgment of the Court of Civil Appeals reversed, and that of the district court affirmed, on recommendation of the Commission of Appeals.

Sanford & Wright, of Eagle Pass, and Lewright & Douglas, of San Antonio, for plaintiff in error.

Boggess & Smith and C. K. McDowell, all of Del Rio, and Ed H. Wicks, of San Antonio, for defendants in error.

McCLENDON, J. This was an action by Ramon Barreda to recover against Craig, Thompson & Jeffries a balance of $2,394 upon a contract by which plaintiff sold defendants certain cattle. Judgment was rendered in the trial court in favor of plaintiff for the

full amount sued for upon an instructed verdict. The Court of Civil Appeals reversed this judgment, and remanded the cause for further trial. 200 S. W. 868.

The only assignments of error in the Court of Civil Appeals relate to the action of the trial court in directing a verdict for plaintiff, and the only question for determination is whether defendants can avail themselves of a subsequent agreement under which they paid a less amount for the cattle than that originally contracted for. So much of the pleading and evidence as is essential to an understanding of the case will be given.

The contract, which was in writing, was executed at Laredo, Tex., on January 9, 1914. Plaintiff was a Mexican citizen, and an adherent of the Huerta government. The cattle at that time were on plaintiff's ranch, some 40 or 50 miles from Monclova, Mexico. The contract very minutely and exactly defined the rights and obligations of the parties. It was written in the Spanish language, but there was no controversy as to the substantial correctness of the English translation attached to plaintiff's petition and introduced in evidence. It provided that the plaintiff sold, and defendants purchased, all the cattle of plaintiff situated upon his ranch Las Cabras at $19 per head, United States currency, except calves of the previous year's breed, branded in December, 1913, which were to be paid for at $5 per head, United States currency. Defendants were to send to the ranch a reliable party, their representative, with sufficient money, and duly authorized to hire at Monclova such men as might be necessary to gather the cattle at the ranch and take them to Eagle Pass, either by rail or driving them all the way, in case trains were not running. When the roundup was completed, the representative of defendants and plaintiff's ranch foreman were to list the cattle, specifying the number over a year old and the number of calves less than a year old; the list to be signed by defendants' representative. Defendants were to pay for the cattle as soon as they reached the American side of the Rio Grande by check on the Laredo National Bank, which bank had in writing agreed to pay the check on presentation. All expenses for gathering and bringing the cattle over, including consular papers, exportation duties, and such other as might occur; were to be exclusively for the account of defendants. If by the time of arrival at the ranch of defendants' representative and cowboys, the cattle had been taken away by revolutionists, defendants were to lose their expenses, with no right of refund from the plaintiff; and if the revolutionists should seize the cattle, taking them away from defendants, the latter agreed to make claim through the government of the United States, and pay plaintiff "when they got the money."

In compliance with the contract, plaintiffs sent their representative to the ranch, who rounded up the cattle and drove them overland to Monclova, where they were loaded upon cars and shipped to Piedras Negras, just across the Rio Grande from Eagle Pass. Upon arrival at Pierdas Negras; a controversy arose between plaintiff and defendants relative to an export duty of 10 pesos, or $4 gold, which the Mexican revenue officials either demanded or were thought to be demanding, before permitting the cattle to leave Mexico. The upshot of this controversy was that defendants refused to proceed further with the contract, unless plaintiff would scale the price for the cattle to $12 gold around per head. There were 450 grown cattle, and 109 calves. Under this proposed alteration of the contract, the total consideration amounted to approximately the original consideration, less the supposed export duty of $4 gold per head. Plaintiff declined this offer at first, but was given until the following morning for final decision, and upon the following morning he accepted the proposition. The cattle were then driven across the river and paid for at the rate of $12 per head around. The export duty was in fact not paid, but plaintiff did not know this fact until after final settlement with defendants. He accepted the reduced price in the belief that defendants had been required to pay the duty.

The theory upon which plaintiff sought to recover the balance under the original contract was that the modified or substituted contract was made upon the consideration that defendants would be required to pay the ten pesos export duty; that defendants falsely represented that they were required to and did pay said duty; and that plaintiff believed same to be true, and, relying thereon, accepted the reduced price. He alleged that the original agreement "had not in any way become oppressive to defendants, and there was no consideration moving from said defendants unto this plaintiff for the alteration of the original agreement."

Defendants resisted enforcement of the original contract upon two special pleas: First, that, at the time the original contract was entered into, plaintiff represented that on account of his relations with the Mexican federal government he would be able to get the cattle to the American side without payment of an export duty. The duty was not in force at the time the contract was made, but it was in contemplation by the Mexican authorities, and it was upon this representation and warranty by the plaintiff that the defendants were induced to and did make the contract under which they agreed to pay all export and other charges; that, upon learning that the duty would be charged, the defendants opened negotiations with plaintiff, and the modified contract was made and

consummated, which amounted to a mutual accord and compromise by the parties. Second, that the defendants, apprehending and believing that the duty had been levied and would be collected, informed plaintiff that they could not and would not carry out the contract, and that thereupon the modification was mutually agreed upon, and the new contract entered into and consummated, and the consideration paid.

[1] We very seriously doubt whether the first plea of defendants would in any event be available, for the reason that it was a palpable attempt to ingraft upon a contract in writing a parol agreement directly antagonistic to the writing, and no allegation of fraud in procuring the writing was made. The pleading concedes that the 10 pesos duty was not in effect at the time the contract was made, and, under the express stipulation of the contract that the defendants were to pay all duties and charges, the 10 pesos duty, in case of its subsequent levy, was clearly within the contemplation of the parties. Moreover, by the very terms of the pleading, it is shown that the parties expected the Mexican federal government to levy some export duty. In the face of this pleading, we are at a loss to find any basis warranting the admission of this alleged parol understanding. The defendants voluntarily executed the agreement with full knowledge of its terms, and charged with knowledge that by the writing they bound themselves to pay whatever duties then existed or might be imposed before the cattle crossed the border. The most that can be said of the verbal understanding or representation was that it amounted to an agreement or representation that the plaintiff would use his influence to get the cattle across without duty, in case a duty should be imposed. Conceding, however, for the purpose of this case, that the verbal agreement or representation had sufficient force in law or in morals to form the basis of a consideration for a subsequent modification of the original contract, in the event a duty were imposed, no rights can be predicated upon this verbal arrangement in the present case, because, as a matter of fact, no duty was paid by the defendants. The whole theory, therefore, of the first defense, falls to the ground.

[2] The second defense, as construed by the Court of Civil Appeals, is in substance that while the contract was still executory, the title to the cattle being in plaintiff until they were delivered on the American side, the parties could mutually abrogate the contract and make a new one, which, when fully executed would be mutually binding, and that as the evidence presented this theory it was error to peremptorily instruct for plaintiff. We cannot agree that the testimony presents the issue that the contract was still

executory as to plaintiff. So far as he was concerned, the contract was fully executed. The cattle had been accepted by defendants and moved by them to Piedras Negras. Nothing remained to be done except pay the duty, if legally imposed, drive the cattle to the American side, and pay plaintiff in accordance with the contract. All these obligations were imposed by the contract upon defendants. The fact that plaintiff assumed the risk of having the cattle taken by revolutionists did not affect the passing of title to the cattle. That stipulation of the contract merely placed upon plaintiff any loss arising from a given contingency. The stipulation would have had no place in the contract, if the title to the cattle had remained in plaintiff until they arrived on American soil. At the time defendants repudiated the contract, the cattle had arrived at a point where all danger of loss, under the stipulated contingency, had passed.

[3] If, however, we should treat the contract as still executory, we cannot concede that the substituted agreement can be enforced under the circumstances of this case. Much has been written upon the question of the right of parties to a contract to modify it by agreements wholly unilateral. The cases upon this subject are collated in an extensive note under Morecraft v. Allen, 54 L. R. A. (N. S.) 1. And while the general right of modification may exist while the contract is executory on both sides, and the circumstances are such as to warrant the inference that the parties acted voluntarily, we think the great weight of authority, as well as the better reasoning, supports the view that such modifications will not be enforced, where the situation of the parties at the time of the modification is such as to negative the inference of voluntary action by the party surrendering his vested rights. It would be difficult to suppose a case where the elements of coercion, extortion, and taking advantage, without justification, of one's necessities, were more palpably in evidence than as here presented. To stamp this transaction with legal approval would violate, in our judgment, every principle of honesty and fair dealing, and place a premium upon repudiation of binding legal obligations, where to do so would be to the pecuniary advantage of the party bound. There are, it is true, some authorities which support the contrary view; but we prefer that line of authorities which under such circumstances holds the parties to their original obligations. The case of King v. Duluth Ry. Co., 61 Minn. 482, 63 N. W. 1105, directly supports the views we hold upon this question. The court in that case held that one who had contracted to build a railroad under stipulations for a definite price for different characters of work could not recover under a modification of the contract raising the price for the work con-

tracted to be done merely because the contract proved a losing one. After referring to authorities which seem to support the contrary view, the court say:

"The doctrine of these cases as it is frequently applied does not commend itself either to our judgment or our sense of justice, for where the refusal to perform and the promise to pay extra compensation for performance of the contract are one transaction, and there are no exceptional circumstances making it equitable that an increased compensation should be demanded and paid, no amount of astute reasoning can change the plain fact that the party who refuses to perform, and thereby coerces a promise from the other party to the contract to pay him an increased compensation for doing that which he is legally bound to do, takes an unjustifiable advantage of the necessities of the other party. To hold, under such circumstances, that the party making the promise for extra compensation is presumed to have voluntarily elected to relinquish and abandon all of his rights under the original contract, and to substitute therefor the new or modified agreement, is to wholly disregard the natural inference to be drawn from the transaction, and invite parties to repudiate their contract obligations whenever they can gain thereby. There can be no legal presumption that such a transaction is a voluntary rescission or modification of the original contract, for the natural inference to be drawn from it is otherwise in the absence of any equitable considerations justifying the demand for extra pay. In such a case the obvious inference is that the party so refusing to perform his contract is seeking to take advantage of the necessities of the other party to force from him a promise to pay a further sum for that which he is already legally entitled to receive. Surely it would be a travesty on justice to hold that the party so making the promise for extra pay was estopped from asserting that the promise was without consideration. A party cannot lay the foundation of an estoppel by his own wrong. If it be conceded that by the new promise the party obtains that which he could not compel, viz. a specific performance of the contract by the other party, still the fact remains that the one party has obtained thereby only that which he was legally entitled to receive, and the other party has done only that which he was legally bound to do. How, then, can it be said that the legal rights or obligations of the party are changed by the new promise? It is entirely competent for the parties to a contract to modify or to waive their rights under it, and ingraft new terms upon it, and in such a case the promise of one party is the consideration for that of the other; but where the promise to the one is simply a repetition of a subsisting legal promise there can be no consideration for the promise of the other party, and there is no warrant for inferring that the parties have voluntarily rescinded or modified their contract."

The court then proceed to discuss the circumstances under which a contract may be legally modified upon the consideration that unforeseen hardships to one of the contracting parties have arisen. The court conclude:

"They must be substantial, unforeseen, and not within the contemplation of the parties when the contract was made. They need not be such as would legally justify the party in his refusal to perform his contract, unless promised extra pay, or to justify a court of equity in relieving him from the contract; for they are sufficient if they are of such a character as to render the party's demand for extra pay manifestly fair, so as to rebut all inference that he is seeking to be relieved from an unsatisfactory contract, or to take advantage of the necessities of the opposite party to coerce from him a promise for further compensation. Inadequacy of the contract price which is the result of an error of judgment, and not of some excusable mistake of fact, is not sufficient."

There is another view, however, which to our mind is conclusive of the correctness of the judgment of the trial court. We have carefully perused the entire statement of facts, and the undisputed evidence clearly shows that the theory upon which plaintiff sought recovery is the only theory presented by the evidence. Waiving aside the testimony of plaintiff and his son, which shows that the sole consideration for the modification of the contract was the supposed export duty of 10 pesos, Guy Thompson, one of the defendants, testified that at the time defendants repudiated the contract, he believed that the duty had to be paid. He testified:

"We were all over there together, the Barredas and us, when they told us—and told the Barredas—there was a duty to be paid, and we entered into the contract under the understanding gained by all of us from the Mexican authorities that the ten pesos duty would have to be paid."                            ●

[4] Plaintiff never knew that the duty was not required until after the settlement was consummated. Whether any of the defendants knew that it would not be exacted before the negotiations to reduce the price were closed may be questioned. It is undisputed that they did not pay the duty, and that when they paid plaintiff, the cattle had reached the American side without export charges. They did not communicate this fact to the plaintiff or his son, and give as their only reason therefor that plaintiff did not specifically call for the information. The undisputed fact remains that the sole consideration for the reduction in the price was as pleaded by plaintiff and as testified by defendant Thompson, "the understanding gained by all of us from the Mexican authorities that the 10 pesos duty would have to be paid," which consideration wholly failed. The trial court, in our opinion, rendered the only judgment which the pleadings and evidence would support.

We conclude that the judgment of the Court of Civil Appeals should be reversed, and that of the district court affirmed.

PHILLIPS, C. J. We approve the judgment recommended in this case.