**HONOLULU OIL CORPORATION**

v.

**TEXAS PACIFIC COAL AND OIL COMPANY.**

Civ. A. No. 1766.

United States District Court
N. D. Texas, Lubbock Division.
March 31, 1956.

Baker, Botts, Andrews & Shepherd, Houston, Tex., Stubbeman, McRae & Sealy, Midland, Tex., for plaintiff.

Hudson, Keltner & Sarsgard, Fort Worth, Tex., Crenshaw, Dupree & Milam, Lubbock, Tex., for defendant.

DOOLEY, District Judge.

The plaintiff Honolulu Oil Corporation has sued the defendant Texas Pacific Coal and Oil Company for an adjudication adversely to the defendant's claim of an overriding royalty interest originating in the assignment of a certain oil and gas lease, which terminated when a well begun by the assignee within, but completed after, the primary term, as extended by such operations, proved to be a dry hole, it being the defendant's position that under the special language of said overriding royalty reservation same has now attached to new leases acquired by said assignee of the earlier lease, and on the same land therein, but several years after the termination of that lease.

On May 12, 1936, the first lease was executed by Ellington and wife to the defendant on certain land in Terry County and Yoakum County, Texas, for a primary term of eight years, beginning October 16, 1938, subject to extension while any well then in progress was being drilled. The defendant, as lessee, kept the lease in force by the required delay rental payment, but did not itself do any prospecting on the land. One Bowden, a lease broker, owned a mineral interest in some adjoining land, where there was shallow production and, thinking that productive development on some of the other land in that locality would tend to enhance his mineral interest, he sought to interest the plaintiff's land man, and in looking at a map in the company's office while in conversation with the land man he noticed that the aforesaid lease had only a short time to run of the primary term, and decided that it would be a likely prospect for a farmout deal. He said that maybe he could get such a deal. This much was

done entirely on his own initiative. The land man told him they might be interested. Then, he talked to a representative of the defendant company, named Hedrick, and in negotiations they worked out the terms of a farmout deal. All of the aforesaid preliminary discussion was in Midland, Texas. Under date of September 11, 1946, the said Hedrick sent an interoffice letter to his superior at the Fort Worth, Texas, home office of the defendant company, this being the first written memorandum on the subject, outlining the pending transaction.[1]

A more detailed and formal statement of the farmout proposal, also dated September 11, 1946, was drawn in the home office of the defendant company, and was submitted, but unsigned, to Bowden for approval. That first version contained a provision as follows:

"It is further understood and agreed that Texas Pacific Coal and Oil Company will also except from said assignment and reserve unto itself and its assigns all right, title and interest below a depth of 5500' from the surface of the ground."

Bowden showed the said unsigned proposal to the representative of the plaintiff company and was told that the plaintiff would not be willing to take a farmout subject to the last quoted reservation. The defendant company then conceded the point and a second version of such farmout proposal, written in Midland, omitting the aforesaid objectionable provision, still keeping the date September 11, 1946, was signed by the defendant's executive vice president and in due course presented to Bowden.

The typewritten farmout letter covers three letter size sheets, but the part of it mostly material now can be covered by quoting the introductory paragraph, one of the seven numbered paragraphs, and the concluding paragraph, to wit:

"Subject to the terms and provisions hereinafter set forth, we agree to assign to you that certain oil and gas lease from F. M. Ellington and wife, Caroline Ellington, to Texas Pacific Coal and Oil Company dated May 12, 1946, (1936) * *, insofar as it covers the N/2 of Section 19 and the SE/4 Section 20, Block K, PSL Survey in Terry and Yoakum Counties, Texas, when you have fully complied with the following conditions:

\* \* \* \* \* \*

"(7) When you have fully complied with all of the provisions herein contained and aforesaid well has been completed as a dry hole or a producing well, we will deliver to you valid recordable assignments of the leases, but it is understood and agreed that Texas Pacific Coal and Oil Company will except from said assignment and reserve unto itself and its assigns, as a free overriding royalty 1/16 of 8/8 of all of the oil, gas and other minerals produced and saved from the land covered by such assignment, * * *.

"It is understood that this letter covers our entire agreement, which agreement will be null and void if not accepted and such acceptance evidenced by a signed copy of the letter returned to us within ten days from the date hereof."

The said Bowden signed his acceptance thereof at the foot of such farmout letter and delivered same to the defendant Company on or about September 14,

---

1. "We have agreed to farmout to W. R. Bowden the north 320 acres of section 19 and the southeast 160 acres of section 20, Public School Lands, Block K, subject to the following conditions:

"Texas Pacific Coal and Oil reserves 1/16 override on the above described acreage.

"A well is to be drilled to sufficient depth to test the Alexander pay.

"Well is to be drilling in time to validate the lease.

"Well is to be tested in such a manner as is satisfactory to the assignee.

"All other terms and conditions usually included in letters of assignment should be included in letter of assignment to Mr. Bowden. Please prepare a letter and forward to Mr. Bowden at once."

1946, and later by letter, and with the consent of the defendant company, assigned all his rights and interests under the said farmout letter to the plaintiff company. Bowden, for his compensation, reserved an oil payment in the amount of $1,000 for each producing well drilled by the plaintiff on the land.

The plaintiff, in turn, and within the primary term, commenced the drilling of a well on the land in compliance with the farmout terms and such work extended the term of the lease during the time same was in progress after the stated primary term. The well was drilled to the required depth, and, in fact, some 10 feet below said depth, but no paying production of either oil or gas was found. It, consequently, was completed as a dry hole about November 11, 1946, then plugged and abandoned on November 21, 1946, and at that time the lease terminated.

On November 20, 1946, the plaintiff company, with a thought to proper provision income taxwise, wrote the defendant company, requesting a formal assignment of the lease, and under date of November 22, 1946, such an assignment to Bowden was drawn and executed by the defendant company, and in due course delivered to the assignee. The overriding royalty stipulation in the defendant's farmout letter was repeated in substance in said assignment, and also another paragraph, not found in the farmout letter, being the main bone of contention in this litigation, was written in, as next quoted below:

2. "Whereas, said lease insofar as it covers the above described land was assigned by T. P. Coal and Oil Company to W. R. Bowden by instrument dated November 22, 1946, * * * reserving to said Texas Pacific Coal and Oil Company, however, a free, overriding royalty of 1/16 of 8/8 of all of the oil, gas and other minerals produced from said land, reference being here made to said instrument of assignment for a more detailed description of said free overriding royalty".

3. "A. Well, your Honor, I construed the two instruments together. I knew that the farmout contract didn't provide for

"It is further stipulated and agreed that the overriding royalties herein reserved shall be delivered to said Texas Pacific Coal and Oil Company, its successors or assigns, or paid for as above provided upon all oil, gas and other minerals produced and saved from the premises herein assigned, in the manner and amounts above set out, whether same is produced under and by virtue of the above described lease, or under and by virtue of any extension or renewal thereof or under and by virtue of any other lease or contract whatsoever whether heretofore or hereafter made by and between the assignee herein, his heirs or assigns, and the true owners of said lands."

Under date of December 20, 1946, Bowden, in turn, executed and delivered a written assignment to the plaintiff company, being an instrument drawn by the plaintiff's lawyer, and a reference was made therein to the overriding royalty originally reserved by the defendant Company.[2]

The plaintiff's lawyer had the farmout letter of September 11, 1946, and the assignment of November 22, 1946, from the defendant company to Bowden, before him and passed said assignment as in compliance with the farmout letter, then he drew the assignment of December 20, 1946, from Bowden to the plaintiff company, and at the trial stated his reasons in testimony quoted below.[3]

any overriding, any override on future leases. There was a letter from TP accompanying the assignment that said that the assignment itself was written in pursuance of that contract.

"When I read the assignment itself it referred to reservations and exceptions to the oil and gas lease, and it described in some detail an overriding royalty interest which I figured was nothing but the description of a,—legal description of an override.

"In any event, then when they came down to this last paragraph that is in controversy here, 1 saw that they were taking care of themselves in case, in

The defendant company did not at the time and does not in this suit question the good faith and fair purposes of the plaintiff company in drilling the dry hole well on said assigned land. In fact, when the defendant company forwarded its assignment to Bowden, the covering letter said in part that: "Honolulu Oil Corporation has complied with all the terms of our completion contract agreement * * *." There was no intimation of any dissatisfaction in the letter.

In the negotiations for the farmout letter of September 11, 1946, the only contact Bowden had with the defendant company was through its agent Hedrick. Hedrick died before and Bowden died after this suit was filed, but his deposition was taken before his death. His testimony was that he did not recall any mention between him and Hedrick that the defendant Company's overriding royalty would also be good against any later lease or leases on the land. He also testified that in his previous experience and familiarity with oil field transactions he had never heard of such an overriding royalty reservation. In other words, there is no evidence that the subject of an overriding royalty, which would run against a future lease, was discussed between Hedrick and Bowden.

The former president (who was executive vice-president in 1946) of the defendant Company conceded that the farmout letter of September 11, 1946, did not recite that the reserved overriding royalty would be effective against future leases.[4]

Undoubtedly, that future lease provision was intentionally written by the defendant company in the assignment of November 22, 1946, from it to Bowden.[5]

The revived interest of the plaintiff Company in the mineral prospects of the land in question was prompted by the circumstance that in November 1949 it drilled a wildcat well about five miles distant and found paying production in what is known as the Glorieta structure,

---

case of an attempted washout, in case of bad faith on the part of Honolulu, by taking care of renewals, extensions and claims by hostile superior title, from true owners of the land.

"I construed the whole instrument as one, both instruments as one, together, and arrived at the conclusion that it was not any intention in there to cover, to put a perpetual interest on production on future leases."

4. "Q. And you know as a fact that in some farmout letter agreements he (manager of the company's land leasing department) did put in that letter a statement that your reserved overriding royalty would apply to future leases? A. Well, as I said, I presume that it was in some of them, and I am sure that it was not in others.

"Q. Well, why wasn't it in this one? A. I don't know why it wasn't in that one, but in a specific case like this TP would make that reservation.

"Q. But it didn't do it in the farmout letter, did it, sir? A. Well, it is not in that letter there."

5. The former president of the defendant company testified on this point as follows:

"Q. Mr. Yager. I want to understand you if I can perfectly. You say you see nothing in that letter there that Mr. Hedrick wrote you that said that he had had any understanding with Mr. Bowden about future leases. Do I understand that you were going to let Mr. Bowden go in there and spend his money drilling a well, and thereafter you were going to put something in the assignment that you had not agreed on with him about? A. Well, that, as I said, was standard procedure.

"Q. And that was what you were going to do here? A. Why certainly.

"Q. Whether you had agreed with Mr. Bowden on it or not, just because that was your standard procedure? A. That's right. And as I said, on the usual farmout agreement on an expiring lease that was always the case.

\* \* \* \* \*

"Q. Well, Mr. Yager, it seems to me that if there were anything in this letter that gave Mr. Bowden notice that you were going to prepare an assignment different from what this agreement calls for that you had the full opportunity to state that in this letter, did you not, sir? A. Well, it could have been stated in the letter, but it doesn't necessarily have to be for us to put it in the assignment, whether it was in the letter or not."

which lies between 5,900 and 6,100 feet deep in that area, and the company thought this indicated some probability that said structure also underlaid the land in question.

The plaintiff company, after acquiring the new leases, the first in 1949 from Ellington and wife, and the others in the next few years from some of their mineral assignees, drilled a producing well on the lands in question in January 1953, 220 feet distant from the earlier dry hole drilled in 1946, but brought in some 600 feet deeper than the said dry hole, and in the Glorieta formation. Five more producing wells in the same formation have been drilled on the premises. The cost of this development has been some $600,000. The defendant company, through its field men, kept up with these operations from the beginning of said drilling program, but did not make any demand under this claim of continuity of its 1946 overriding royalty interest until some eight months later.

The preceding review is a sufficient survey of the material facts and this opinion will turn to the questions of law.

First will be noticed the plaintiff's position that the farmout letter and the defendant's assignment, when properly construed, in the light of all the attending circumstances, do not reflect any outright conflict in respect to the defendant's reservation of an overriding royalty, but that taken together both of same manifest the simple purpose on the part of the defendant company to guard against any "washout" of the lease defendant had held on the Ellington land. The force of this argument turns on the fact that there is no charge of any double dealing that could look like an attempted washout on the part of the plaintiff in taking the new leases in 1949 and later years. The plaintiff's reasoning in this respect, however, is not plausible. If the reference to the overriding royalty holding over against future leases, had been included in the farmout letter, then the plaintiff would have a strong point, particularly in view of the fact that the lease faced an early expiration date, un-

less prolonged by development, but here it must be kept in mind that when the defendant wrote the provision, which has provoked this litigation, in the assignment it knew that the lease had expired and also that the plaintiff had dealt fairly with it in the dry hole test on the land, and, against that background, it is far-fetched to think that the defendant was taking precaution against a fanciful washout attempt. Instead, the defendant, taking all the pains to write this provision in the assignment, evidently meant the language in its literal sense and presumably was trying to secure just such a hold as it claims in this lawsuit. The state of things right then was favorable for the chance that such provision would go by unchallenged. The dry hole could have predisposed the plaintiff to write the whole venture off without much attention and no anticipation that it would ever want a lease on the land again in later years. The plaintiff's lawyer did not overlook this provision, but explained that he thought it was only directed as further precaution against any washout development. In that respect, the meaning of the provision was misjudged. The plaintiff's counsel herein also impute significance to the words "true owners of said lands", contained in the provision in question, and say that this is a key leading to the interpretation that the defendant was just striking at leases which might be taken from hostile and paramount third-party owners, but the more reasonable sense of the language is that same takes cognizance of the fact that Ellington apparently had sold off some of his mineral interest before the expiration of the lease, or, at least, it could be anticipated that he might, as he did, sell off some of such interest thereafter, and, really the language falls in better with the view the defendant was making an outright effort to secure a projected overriding royalty under any future lease or leases, whoever might be the lessors therein. In short, it is obvious to say that if the overriding royalty terms in the assignment had been con-

fined to wording the same as that in the farmout letter, there would have been no semblance of a foothold for the present claim of the defendant company and this accentuates the material variance between the two instruments.

One of the contentions made by the defendant company is that an overriding royalty, worded to hold over against future, and even disjoined, leases, is lawfully effective to create a valid contractual right or mineral interest, and no case holding that such a covenant is a nullity has been cited. On the contrary, the Court of Appeals for this circuit has assumed that such a transaction has no hindrance in law.[6] Furthermore, the Supreme Court of Oklahoma went a step further and declared the validity of such an agreement.[7] The direct question apparently has not been discussed by any court in Texas. This point, however, if taken favorably to the defendant company, is not enough alone to uphold its claim herein. However sound the theory of validity may be in the abstract, it must stand in reserve until the defendant company shows there was, in fact, an agreement, with the requisites of a contract, between it and Bowden for the creation of such an overriding royalty. The difficulty of the defendant arises from the plain facts that there is no proof of any discussion about such an overriding royalty in the preliminary negotiations between Bowden and Hedrick, nor is there any provision for such an overriding royalty in the farmout agreement, which recited expressly that it "covers our entire agreement", and all of the duties and obligations of the plaintiff company, as Bowden's assignee under the farmout letter, had been fully performed and discharged when, for the first time, and after the dry hole had been plugged and abandoned, the defend-

ant inserted in its assignment to Bowden the new paragraph, which sought to make the overriding royalty effective against future leases. The defendant, in making the rejected effort to reserve the deep mineral rights in the land, wrote such stipulation in the first version of the farmout letter, realizing that was the proper place for it, and the defendant had the same reason to know that the proper place for a provision to carry the overriding royalty interest against future leases, likewise, would have been in the farmout letter. The defendant would meet its problem by saying that, regardless of any discrepancy in respect to the overriding royalty provisions between the farmout letter and its assignment, there was a merger in law, which left the assignment as the definitive and controlling contract of the parties. The obstacles to such a theory of law are, (1) it contradicts unilaterally the previously declared intention of the parties that the farmout letter evidenced their whole agreement; and (2) the lease had become non-existent and the defendant's transfer was only a paper assignment; and (3) the farmout contract had been fully executed by the plaintiff before the execution of the defendant's assignment.

The courts have generally held that a party, upon full performance of his obligations under an initial contract, then has a vested right to return performance by the other party under the same contract, and his right to such mutual performance cannot be qualified or burdened by additional requirements, in the name of merger, under some later gratuitous promise or assent in the guise of a contract.[8]

The question of merger, where one party has fully performed, so that the initial contract is no longer executory, really overlaps with the requisite of con-

6. Gordon v. Empire Gas & Fuel Co., 5 Cir., 63 F.2d 487.

7. Thornburgh v. Cole, Okl., 207 P.2d 1096.

8. Wiedeman v. Howell, Tex.Civ.App., 276 S.W.2d 380; Fisher County Pipe Line Co. v. Snowden & McSweeney Co., Tex. Civ.App., 143 S.W.2d 675; Cotulla v. Barlow, Tex.Civ.App., 115 S.W. 294; Miller v. Nacol, Tex.Civ.App., 224 S.W.2d 734; McCall v. Texas Dragline Service Co., Tex.Civ.App., 188 S.W.2d 243; 26 C.J.S., Deeds, § 91c, page 340.

sideration in contract law. This is another barrier to the claim of the defendant. The cases hold that, where one contracting party, by performance, has matured his right to demand performance from the other party, any other onerous promise or assent made by the first party, with no inducement except that the other party perform what he is already bound to do, is without consideration and not binding in law. Some of the many cases and texts in point are noted below.[9] The defendant has emphasized that the plaintiff accepted the assignments, one from the defendant to Bowden and the other from Bowden to the plaintiff, and, also, in March 1947, executed a formal release of the expired lease on the land in question, but there is nothing in that to impart any consideration subjecting the plaintiff to an onerous burden outside of the terms of the farmout letter.

What has been said above in the discussion of merger and lack of consideration derives from the law developed in typical cases. This lawsuit, however, instead of being typical is, perhaps, unique in its factual framework. The change necessary in this litigation to convert same into a typical suit would presuppose that the well drilled by the plaintiff in 1946, instead of being a dry hole, was a paying producer of oil or gas, and, even then, the defendant could not prevail on the provision for an overriding royalty good against future leases under the law of merger or other principles of contract law. In order to keep a balanced view of this controversy, the actual and peculiar facts here must have full force in the final analysis. It is obvious that when the dry hole was drilled, plugged and abandoned, at one stroke the lease in question became extinct and the defendant had no further power to make an operative conveyance by its assignment of the one-time leasehold estate. In other words, the plaintiff had performed its part of the bargain, but the defendant had become disabled to perform by a contingency inherent in the transaction. These circumstances really, if anything, raise a stronger barrier against the defendant than would be true in a typical case.

The above rulings make it unnecessary to decide the points made under the rule against perpetuities discussed in the briefs of respective counsel.

It follows that judgment herein will be rendered for the plaintiff.

9. Jones v. Risley, 91 Tex. 1, 32 S.W. 1027; Carrothers v. Stanolind O. & G. Co., D.C., 134 F.Supp. 191; Wiedeman v. Howell, supra; Witherspoon v. Green, Tex.Civ.App., 274 S.W. 170; Kahn v. Ilitzky, Tex.Civ.App., 107 S.W.2d 1015; Barreda v. Craig, Thompson & Jeffries, Tex.Com.App., 222 S.W. 177; Panhandle Refining Co. v. Bennett, Tex.Civ.App., 13 S.W.2d 923; Bonzer v. Garrett, Tex.Civ. App., 162 S.W. 934; Szanto v. Pagel, Tex.Civ.App., 47 S.W.2d 632; Corbin on Contracts, Section 175, page 568; and Williston on Contracts, Section 130, page 443.