**DE PUY v. LONE STAR DREDGING CO., Inc., et al.**

No. 11130.

Court of Civil Appeals of Texas. San Antonio.

April 29, 1942.

As Modified on Denial of Rehearing May 27, 1942.

Boyle, Wheeler & Gresham and Richard T. Davis, all of San Antonio, for appellant.

Pichinson & Alsup, of Corpus Christi, for appellee.

NORVELL, Justice.

J. DePuy, appellant, contends that the judgment of the trial court awarding Lone Star Dredging Company, the appellee, a recovery of $23,400, upon a jury verdict, should be reversed because the trial court, upon proper motion, failed to set aside certain findings of the jury.

DePuy was the general contractor upon the Bay Front Improvement project of the City of Corpus Christi, and agreed to construct a sea wall extending from the Bascule Bridge on the north to Craig Street on the south, some twenty-five city blocks in length along the Corpus Christi Water Front. The wall was to be located approximately parallel with and 600 feet east of Water Street, which then ran north and south along the bay front. It was provided that the area between the sea wall and Water Street should be raised in elevation by filling the same with material dredged from Corpus Christi Bay.

The work relating to the dredging and hydraulic fill required by the general contract was sublet by DePuy to appellee at the same price per cubic yard (8½ cents) as that provided for in the general contract.

■ Appellee, as plaintiff below, pleaded for a recovery for various amounts, upon thirteen separate items or claims. No issues were submitted upon three of these pleaded items of damages and they were therefore waived. Issues relating to seven additional claims were answered unfavorably to appellee and no recovery allowed therefor. Appellee did not perfect a cross-appeal, nor file cross-assignments of error.

The jury answered issues submitted in connection with three of appellee's claims favorably to it, and the judgment before us is based upon these findings.

The determination of appellant's contention that the trial court erred in rendering judgment upon each of the sets of issues involved in these three claims is decisive of the appeal, and we need not determine whether or not there was evidence sufficient to justify the submission of those issues which were answered favorably to appellant, i. e., whether or not a peremptory instruction should have been given.

The three items upon which recovery was allowed are (1) $17,250, for the grading of streets, (2) $1,350, for shifting of the dredge, and (3) $4,800, for a shut-down of the dredge.

■ We consider first the item of street grading. The jury found that DePuy had instructed appellee to excavate the streets upon the hydraulic fill (Issue 13); that such excavating was extra work, which was defined as being work outside and independent of a contract, something not required or contemplated by the parties in the performance of the contract (Issue 14); that DePuy had agreed to compensate appellee for the excavation of said streets (Issue 15); that appellee has excavated "approximately 24,000 cubic yards" (Issue 16), and that the reasonable cost per cubic yard was 75 cents (Issue 17). The trial court computed the amount of the judgment upon this item on the basis of 23,000 cubic yards in view of the jury's use of the word "approximately." We express no opinion as to the correctness of the trial court's action in this particular.

As to the completed surface of the hydraulic fill, which was to be placed between the sea wall on the east and Water Street on the west, the plans provided for a splash area (concrete surfaced) about twenty feet in width lying immediately west of the sea wall. The plans also provided for the construction of a two lane roadway (Shoreline Boulevard) running north and south along the bay front, located adjacent to and west of the splash area. Each lane was forty feet in width and they were separated in most places along the course by an area or parkway which generally approximated eighty feet in width. The plans also provided that streets running east and west should be extended from Water Street to Shoreline Boulevard and typical street intersections were shown. The grade of the boulevard and the streets, as shown by the plans, was eight to twelve inches below that of the surrounding areas. Paving of the boulevard and certain intersecting streets was also provided for.

There were obviously two methods of placing the fill so that the surface contour thereof would comply with the plans. The area occupied by the fill could be brought to a relatively uniform grade throughout the entire area and then the parts thereof to be occupied by the boulevard and streets could be excavated so as to bring them to the grade designated in the plans. This method of constructing, placing and finishing the fill seems to be in accordance with appellee's construction of the sub-contract here involved, that is, appellee contends that his contract only obligated him to bring the fill to a level relatively uniform throughout the area, and that "excavation" for roadways was not a part of his contract and was therefore an "extra."

On the other hand, the various parts of the hydraulic fill could be brought to specified grades or elevations resulting in the formation of the requisite surface contour, that is, areas not to be occupied by streets could be brought to elevations above street grade by the deposit of additional materials thereon. This seems to be appellant's theory of the method of placing the fill as contemplated by the provisions of the sub-contract.

The contract between appellant and appellee, in part, provides:

"The Sub-contractor agrees to do the dredging of approximately 1,550,856 cubic yards and the hydraulic fill complete as

required in the plans and specifications and contract between J. DePuy and the City of Corpus Christi, for the sum of Eight and one-half (.08½) Cents per cubic yard of hydraulic fill in place, which price includes the dredging, removing obstructions in the dredging areas, clearing the site of the hydraulic fill, disposing of material cleared off the work, completion of the hydraulic fill, along with all equipment, tools, labor, materials, extra material for shrinkage, all insurance and bond, and other incidentals necessary to complete the work.

"Payments for the hydraulic fill back of the seawall will be made on or about the 10th of each month on the cubic yards included in the monthly estimates of the Engineers of the City of Corpus Christi under the terms of the contract between J. DePuy and the City of Corpus Christi designating 10% withheld until the completion of the work, and J. DePuy agrees to pay the Sub-contractor immediately upon receipt of his monthly payments from the City of Corpus Christi."

We have heretofore discussed parts of the plans incorporated in the general contract which are applicable to the sub-contract by the reference therein contained. The specifications of the general contract relating to the hydraulic fill which necessarily must be considered a part of the sub-contract provide:

"26.1 General: The hydraulic fill shall be made in accordance with the plans and to the lines and grades established by the Engineer. * * *

"26.8 Depositing Material: Excavated material shall be deposited in accordance with the plans and the grades and lines of the Engineer; and dredging and filling shall progress in sequence approved by the Engineer. * * *

"26.9 Finishing: The hydraulic fill shall be given a smooth finish, and the grade of the completed fill over any area one hundred feet square shall average the grade established by the Engineer and shall not be more than two-tenths (2/10) foot below grade at any point."

As to lines and grades, the specifications provide that "all parts and units of the project shall be constructed in accordance with the plans and to the lines and grades established by the Engineer and shall be so maintained until final acceptance."

The plans and specifications of the general contract applicable to the hydraulic fill constitute a part of the sub-contract by reason of the wording employed in the latter instrument. It seems apparent that the engineer by setting his lines and grades could determine the surface contour of the hydraulic fill. He could provide that the area between streets should have an elevation eight to twelve inches higher than that of the street. Further, the evidence shows conclusively that he did so and that appellee was actually paid upon estimates made by taking into account the lines and grades so set by the engineer.

We hold that appellee, having agreed to place the hydraulic fill in accordance with the grade and lines set by the engineer, was bound to fill to such lines and grades as were actually set by the engineer, in the absence of a showing that the engineer set said lines and grades in a manner or in pursuance of a plan wholly unauthorized or prohibited by the contract from which the engineer derived his authority. No unauthorized action on the part of the engineer is shown. It is apparent that the specifications as to the finish of the hydraulic fill under any possible construction of the contract could not be complied with by dredging alone—some grading work was necessary. Further, it appears that such earth as was actually taken from the streets to bring them to grade was actually deposited upon other areas to bring them to grade and was paid for at the contract price.

From what has been said, it follows that the trial court erred in refusing to grant appellant's motion to disregard Special Issues Nos. 13 to 17, inclusive, as a basis for judgment. Watson Co. v. Bleeker, Tex. Civ.App., 283 S.W. 260; Linde Dredging Co. v. Southwest L. E. Myers Co., 5 Cir., 67 F.2d 969.

Special Issue No. 14 is either predicated upon an erroneous construction of the sub-contract or calls upon the jury to pass upon a matter of law, i. e., the construction of the contract. The record of the evidence relied upon to support the finding (Issue 15) that DePuy agreed to compensate appellee for "excavating" the streets discloses that he promised to pay additional compensation only in the event such work was actually an extra. This issue consequently falls with No. 14. The remaining issues of this group are obviously insufficient as a basis for judgment.

■ We next consider the item of recovery based upon the shifting of the dredge upon orders from DePuy. This part

of the judgment is based upon the findings of the jury that DePuy caused appellee "to shift the dredge from point to point along the seawall construction" (Issue 23); that such shifting delayed appellee (Issue 24) for three days (Issue 25) which damaged appellee in the sum of $666.67 per day (Issue 26). The amount of money allowed upon this item was reduced to $450 per day by remittitur filed in the trial court.

It appears that DePuy wanted an earthen platform constructed outside the line of the seawall from which the wall itself could be erected. The sub-contract provided that: "The Sub-contractor further agrees if and where required by J. DePuy to extend the hydraulic fill during the first lift to the approximate elevation of 2.5 outside of the line of the steel sheet piling under the seawall in order that a working area of approximately thirty feet is furnished on the Bay side of the Seawall above sea level. This additional hydraulic fill will be paid for monthly on or about the 10th of each month at a price of eight and one-half (.08½) Cents per cubic yard."

It appears that numerous shifts of the dredge were made. Some shifts were made at the request of DePuy in order that the earthen platform might be extended, while numerous other shifts were made by appellee in order to procure new material and proceed with dredging operations in accordance with the contract. We can not say that the evidence offered by appellee would sustain a finding that any particular shift of the dredge under orders of DePuy was unreasonable or unnecessary. The jury simply found that DePuy caused appellee to shift the dredge and that this caused some delay and damage to appellee. As the contract bound appellee to extend the hydraulic fill if and where required by J. DePuy, it follows that the dredge would have to be shifted whenever necessary to extend the fill under DePuy's orders, and DePuy can not be held liable in damages for the exercise of a contract right, even though his action did cause some delay to appellee and render its performance more onerous. No breach of contract on the part of DePuy is shown. Ripley v. United States, 223 U.S. 695, 32 S.Ct. 352, 56 L.Ed. 614. See also, Annotation, 115 A.L.R. 71. A recovery of damages for delays caused by the shifting of dredge on DePuy's orders must be denied.

As to the third item of recovery permitted by the trial court, the shutdown of the dredge, the jury found that J. DePuy instructed appellee to shut down between April 4 and April 20, 1939 (Issue 1); that he agreed to compensate appellee for said shutdown (Issue 2), and that "the reasonable value, if any, per day, to plaintiff (appellee) of said shut down time" was $300 per day.

The contract between DePuy and appellee contained the following provision, which is pertinent here: "The progress of the work shall be as directed by J. DePuy or his superintendent in charge; briefly, the outline of the work now contemplated will be to complete the dredged fill to approximate elevation of 2.5 feet above sea-level along the entire water front, that is to be protected by the seawall, then later as the seawall is constructed to complete the hydraulic fill."

It appears that prior to the commencement of work a method of procedure in carrying out the terms of the general contract was adopted by the engineers of the City and Mr. DePuy. It was decided that the sub-contractor who had contracted the driving of piling for the seawall should commence at the north end of the project and work south, while the dredging contractor would start at the south end of the project and work north. This decision was made known to appellee.

While appellee, the dredging contractor, was engaged in building the levee or platform outside the proposed location of the seawall, its dredge met the dredge of the pile driving contractor working from north. One or the other of the operations had to be temporarily shut down, a result easily foreseen when the plan of procedure was adopted. Under these circumstances, DePuy, in ordering the appellee's dredge shut down, was within his contract rights as set forth in his contract with appellee, which provided that the "progress of the work shall be as directed by J. DePuy or his superintendent in charge."

The trial court overruled appellant's objections to the trial court's charge upon the particular issues here under discussion, which were based upon the failure of the court to submit to the jury the element of the reasonableness of DePuy's action in ordering the shut down. The situation is therefore similar to that presented by the group of issues submitted in connection with the shifting of the dredge.

The same principles are applicable and no liability can be predicated upon DePuy's doing that which he had a right to do under the contract. Appellee's recovery upon this item can not stand, therefore, unless it can be supported by the jury's finding that DePuy agreed to compensate appellee for the shut down of the dredge.

The testimony of appellee's witnesses is not entirely clear as to the conversation with DePuy in which the agreement was supposedly made. It is rather uncertain whether DePuy unequivocally agreed to pay for the shut down, or only agreed to pay for the same in the event he was not authorized to order the shut down under the contract. It seems that DePuy, on a number of occasions, told "the same old story, anything not in the contract would be paid for"—to use an expression of one of the witnesses.

However, if we construe the conversation as supporting the jury's finding, such agreement would be without consideration, as DePuy had the right to order the shut down under the terms of his contract. Jones v. Gilchrist, 88 Tex. 88, 30 S.W. 442; Restatement of the Law, Contracts, Sec. 76, Example 8; Annotations, 25 A.L.R. 1450, and 55 A.L.R. 1333.

█ Contracts for additional compensation for doing that which one is contractually obligated to do are discussed in the well considered case of Blakeslee v. Board of Water Commissioners of City of Hartford, 106 Conn. 642, 139 A. 106, 111, 55 A.L.R. 1319, wherein it is pointed out that such contracts are generally held unenforcible for the reason "that broadly to admit the power of a contractor to exact additional compensation by refusing to continue performance would afford too many opportunities for exactions approaching very near to extortion." It is, however, suggested that "where the contractor can justify his refusal to proceed with the contract by showing that he is confronted with circumstances not contemplated when the contract was made which render its performance impossible or unduly onerous and the promisor, being informed of the situation, induces him by a promise of additional compensation to proceed with it, the contractor's right to that compensation ought justly to be recognized."

Appellant's pleadings relating to the shut down here involved are not based upon the above or any similar doctrine, nor do they suggest a legitimate and bona fide dispute as to the meaning of the provisions of the contract and a consequent settlement of such differences by a valid agreement. Appellant's pleaded theory is that DePuy presumedly without authority under the contract ordered the shut down, that appellee notified him of a charge of $300 per day for the time the dredge was shut down; that such charge was reasonable, and appellant had failed to pay it. The holding that DePuy, under the provisions of the contract, was authorized to order the shut down is decisive of this cause of action.

We hold the trial court erred in overruling appellant's motion to disregard the findings of the jury upon which the judgment is based. The judgment appealed from is reversed and judgment here rendered that appellee take nothing.