I do not agree that the trial judge abused his discretion in making final the judgment against Ricard and his sureties for $350, the amount they contracted to pay in the event Ricard failed to appear at the time set for his trial.

The appellant's sureties signed the bond in consideration of a fee based upon the amount of the obligation they assumed. The principal's failure to appear in December 1959 was wilful and accomplished his purpose, which was to avoid a trial and cause his case to be continued and trial postponed for some eleven months.

Art. 439, Vernon's Ann.C.C.P. does not require the trial judge to remit any part of the sum specified in the forfeited appearance bond. It merely provides that the court *may at its discretion* do so.

The appellants, at the hearing in the trial court, did not request or seek a remission of a part of the judgment nisi forfeiting the $350 bond. They sought to set aside the forfeiture.

Appellants in this court do not seek or pray for remission of any portion of the amount for which the forfeiture was made final, but to set aside such final judgment.

It is my position that this court is without authority to require remittitur of any part of the final judgment appealed from, and that a remission of $250 of the $350 judgment nisi is not justified under the record.

On State's Motion for Rehearing.

MORRISON, Judge.

We erroneously referred in our original opinion to "appellant," whereas the phrase should have been "the principal." Our original opinion is corrected in this respect.

The State now calls our attention to the fact that the principal did not appeal. The judgment as to him, therefore, remains undisturbed. Remittitur having been filed, the judgment rendered against the appellant sureties is reformed so as to provide for the recovery against them of the sum of $100 and all costs. As reformed, the judgment is affirmed.

The State moves that we amend the style of the case in view of the fact that the principal did not appeal. An examination of the records of this Court reveals that appeals in bond forfeiture cases have consistently been styled in the trial court and in this Court in the name of the principal in the forfeited bond "et al." without regard to whether the appeal was by one or more sureties alone, or by both the principal and his sureties.

Appellants having superseded the judgment by supersedeas bond, it is ordered that judgment be entered against the sureties thereon for the performance of the judgment as reformed and affirmed.

The State's motion for rehearing is overruled.

**KING CONSTRUCTION COMPANY,**
Appellant,

v.

**W. M. SMITH ELECTRIC COMPANY,**
Appellee.

No. 7298.

Court of Civil Appeals of Texas.

Texarkana.

Aug. 29, 1961.

Rehearing Denied Nov. 21, 1961.

Raffaelli & Keeney, Texarkana, for appellant.

Norman C. Russell, Atchley, Russell & Hutchinson, Texarkana, H. L. Morrison, Jr., Dallas, for appellee.

DAVIS, Justice.

On or about December 4, 1956, W. M. Smith Electric Company, hereinafter referred to as Smith, conveyed to King Construction Company, hereinafter referred to as King, an estimate upon an electric overhead crane, as "specified" by the Atomic Energy Commission, in connection with a contract that was about to be let for the construction of a plant near Amarillo, Texas. Smith submitted an offer to sell the overhead crane, as "specified", for a total price of $16,691 f. o. b., factory. As the result of the offer by Smith, King made a bid with reference to the overhead crane at a total price of $17,900.

On December 5, 1956, King was awarded a contract, with penalty provisions, to build the plant, and was to commence work immediately. On December 6, 1956, King entered into an oral contract with Smith, and Smith agreed to sell to King the overhead crane, as "specified", for the sum of $16,691.00. On December 12, 1956, Smith informed King that it would not deliver the overhead crane for $16,691. Smith made the excuse that the Inspector and the Atomic Energy Commission would not approve the crane Smith "proposed" to deliver. King had already contracted on the basis of the previous bid. King instructed Smith to go and see if it was possible to get the crane Smith "proposed" to deliver approved. An agent of Smith went to Burlington, Iowa, and Muskegon, Michigan.

After many telephone calls and other communications, a written contract dated January 8, 1957, was entered into between Smith and King, whereby Smith agreed to sell to King the same crane (as specified) for the sum of $30,750. Prior to the signing of this contract, King had insisted that the crane be delivered for $16,691. King did place an order to Smith for the crane at the price of $30,750, but Smith refused to ship the crane until King had signed the written contract.

Prior to signing the contract, King made other contacts for the purpose of trying to

purchase a crane elsewhere. It learned that there had been only one such crane built in prior years. Smith was the agent for the company that built the crane. There were other companies that built overhead cranes, but none of them would be approved. King was forced to sign the contract for the purchase of the crane so it could build the plant according to its contract.

The crane was delivered and installed. King paid 85% of the $30,750, which it had contracted in writing to pay for same. King then refused to pay the balance of $4,612.50, and Smith filed suit. King answered and filed a cross-action setting up that it had overpaid Smith the sum of $9,446.50, and asked for a judgment for that amount against Smith.

The court entered a judgment in behalf of Smith for the sum of $4,612.50, and a $750, attorney's fee. From this judgment King has perfected its appeal and brings forward nine points of error.

The court filed his findings of fact and conclusions of law.

By its point No. 5, appellant complains of the action of the trial court in holding that King was not compelled by duress to enter into a new contract, and the original contract was novated. The court found that Smith knew that the crane which it "proposed" to deliver to King for $16,691 did *not* meet the "specifications" as contained in the contract between King and the Atomic Energy Commission. The court found that King did not know that the crane Smith "proposed" to deliver did not meet the "specifications" and requirements as contained in the contract. The court found that King was not compelled by fraud or duress to enter into a new contract with Smith, but King only did so by reason of *fear of economic loss.* Only one such motor had previously been built. It was built by Manning, Maxwell and Moore, represented by Smith. King was under a contract which provided penalties in case of delay. There could not be another mo-

tor purchased elsewhere. Manning, Maxwell and Moore built the cranes and sold them through their agents.

It seems that Smith took an undue advantage of King in refusing to deliver the crane "specified" for the price of $16,691. As a result thereof, King was at a loss. It could not acquire the crane elsewhere, and actually it was compelled by virtue of fear of economic loss (a duress), to enter into the signed contract.

Under the law as stated in 31 Tex.Jur. 383–407 "Novations", a contract that has been entered into *can not be novated* without the absolute agreement on the part of both parties. 31 Tex.Jur. 387–8, Sec. 5, reads, in part, as follows: "* * * A reaffirmation by a party of his obligation under a contract, with a request that the other party comply with his undertaking, there being no change therein, *is obviously* not a novation." (Emphasis added.) There is no evidence of such agreement.

31 Tex.Jur. 398, Sec. 12, the novation of a contract requires the extinguishment of the old obligation by the giving and acceptance of a new promise. There is nothing said in the new contract between Smith and King to the effect that the new contract was in lieu and in discharge of the old one. 31 Tex.Jur. 398 to 402, Secs. 12, 13 and 14. Under the question of fraud and mistake, agreements, etc., see 31 Tex.Jur. 383–407; 46 Cor.Jur. 573 to 594; 66 C.J.S. Novation §§ 1 to 15, pp. 681 to 696; 39 Am.Jur. 254–273. On the question of merger instead of novation, see 17 C.J.S. Contracts §§ 379 to 384, pp. 871 to 876.

 Smith knew that the crane which it "proposed" to deliver for $16,691, did not meet the "specifications" contained in the contract between the Atomic Energy Commission and King, and after some efforts to get them to approve the same, it just refused to deliver the crane that would meet the "specifications". King contacted other manufacturers relative to such a crane, but could not find one. There is no evidence in the record that any mutual agree-

ment was made between the parties that they would forget about and supersede the oral contract, and there is no evidence on the part of either party to the effect that a novation of the original contract would be made. A novation must be according to the intention of all parties to a contract. Such intention is never presumed. 31 Tex. Jur. 394, Sec. 9; Scott v. Atchison, 36 Tex. 76; 38 Tex. 384; Cooper Grocer Company v. Strange, (Tex.Com.App.) 18 S.W.2d 609; McElwrath v. City of McGregor (Tex.Civ. App.) 58 S.W.2d 851, err. dism.; Austin v. Guaranty State Bank of Copperas Cove, et al. (Tex.Civ.App.) 300 S.W. 129, n. w. h.; Hix et al. v. Tomlinson (Tex.Civ.App.) 200 S.W. 897, n. w. h.; General Finance & Guaranty Company v. Smith, Tex.Civ.App., 309 S.W.2d 531, er. ref., n. r. e.; Chastain, et al. v. Cooper & Reed, (Tex.Civ.App.) 250 S.W.2d 652, affmd. 152 Tex. 322, 257 S.W.2d 422; 31 Tex.Jur. 395, Sec. 10, and 31 Tex.Jur. 404, Sec. 17. Appellant's point 5 is sustained.

By its Second, Third and Fourth points of error, King takes issue with the findings of fact and conclusions of law. King takes the position that under the undisputed evidence in the case, it is entitled to judgment. Smith did rescind the oral contract of December 6, 1956, without any reason whatsoever. King takes issue with the trial court in its conclusion of law that by signing the contract it agreed to and did abandon its oral contract of December 6, 1956. King had bound itself to a contract with *penalty provisions* with the Atomic Energy Commission. Smith knew about the contract. Smith also knew that there was no other place that King could get a crane like the one ordered, and knew that King had to proceed with its contract, regardless, to get the job done. There is much evidence in the record about the difficulties between the parties, but nowhere in the record is the finding and conclusions of the trial court supported by the evidence, and it is not supported by the law. See authorities cited above. The points are sustained.

By its Sixth, Seventh, Eighth and Ninth points of error, King complains of the action of the trial court in holding that King agreed to and did abandon and rescind the oral contract; in holding that the oral contract of December 6, 1956, was extinguished, and that the written contract was substituted therefor; in holding that by the signing of the written agreement there was effected a novation whereby the oral contract was extinguished, and a valid and binding contract was created; and, in holding there was no consideration for the latter written agreement of King to pay Smith the sum of $30,750.00 for the crane. There is no evidence of any mutual agreement between the parties to rescind the oral contract. The new contract does not supersede the old contract. The new contract does not mention the oral contract. The mere signing of a contract dated January 8, 1957 is not of itself a novation of an oral contract of like character, except for the price of the crane. In Chastain v. Cooper & Reed, supra, Judge Cramer said:

"Novation is a mode of extinguishing one obligation by another,—a substitution, not of a new paper, *but of a new obligation in lieu of an old one*— the effect of which is to discharge the old obligation and the acceptance of the new obligation in its place. Each element of novation must be proven, and of course it is only where there is no doubt as to the terms of the agreement that it becomes a question of law.

"After Whiteley-Phillips agreed to accept Warren Wright in lieu of Chastain on the drilling contract, a written contract was to be executed by Warren Wright. It is undisputed that Whiteley-Phillips, after Marshall's name came into the deal, knew that Marshall was to be substituted for Warren Wright, and demurred to such agreement by preparing the written drilling contract for both Chastain and Marshall to sign. Chastain then refused to sign the written drilling contract prepared for him and thereafter Whiteley-Phil-

lips struck out the name of Chastain and executed the contract for the drilling of the well with Marshall alone. The drilling contract was dated September 20, 1948, and Marshall alone signed it with Whiteley-Phillips Drilling Company. Whiteley-Phillips then proceeded to go forward with the drilling of that well under the written contract. *Under such undisputed facts, liability of Chastain for the drilling of the well became a question of law, not a question of fact for the trier of the facts."* (Emphasis added.) [152 Tex. 322, 250 S.W.2d 659]

In that case, the man refused to sign the other contract. In this case, if King had refused to sign the new contract he would not have received the crane, and could not have built the atomic energy plant.

The trial court found that King relied upon the quotation of $16,691, in making its bid to erect the atomic energy plant; that Smith offered to sell the crane as "specified" for $16,691, f. o. b., Muskogen, Michigan, with a delivery time of fourteen weeks; that King did not know the fair cash market value of the crane, as "specified", to be approximately $31,000; that Smith knew that King would rely upon the quoted price in making its bid, and did not know that the crane Smith "proposed" to deliver did not meet the "specifications". The trial court further found that "time was of the essence in the contract awarded by the Atomic Energy Commission to King Construction Company", and King was notified to *proceed at once.* King promptly did proceed, and on December 6, 1956, notified Smith to get the crane as specified, fabricated and delivered, due to the time limit involved. It must be borne in mind that the crane that Smith "proposed" to deliver did not meet the "specifications" as contained in the contract with the Atomic Energy Commission. Smith did not inform King that the crane it "proposed" to deliver did not meet with the "specifications". The offer submitted by Smith for the crane was the only offer received by King which stated that it was of the type "required by the specifications". On December 12th, or 13th, 1956, without any legal excuse whatever, King was informed that the crane Smith "proposed" to deliver did not meet the "specifications". Further action was taken, but suffice it to say that the trial court found that King signed the contract for the delivery of the crane by "reason of fear of economic loss".

The writer believes that "fear of economic loss", includes a finding of duress. In the case of Housing Authority of City of Dallas, Texas v. Hubell et al. (Tex.Civ. App.) 325 S.W.2d 880, 902, wr. ref., n. r. e. Chief Justice Dixon had this to say relative to the signing of such agreement:

"Duress is a tort. It often arises in connection with breach of contract, but it is nevertheless a tort, and it is not necessary that there should have been privity of contract between the parties as a prerequisite for such a tort action. One who sustains damage as a result of being subjected to duress may sue as plaintiff against the wrongdoer. 'Economic coercion', the basis of Lewis' cause of action, is generally considered a form of duress.

"In 52 Am.Jur. 380 it is said 'It is worthy of notice that a tort may involve acts which also constitute a breach of contract, and that the same facts will sustain either an action ex delicto or ex contractu, so that an action ex delicto will lie, notwithstanding the act complained of would also be ground for an action ex contractu. Under this rule, it has been held that accompanying every contract there is a common law duty to perform with care, skill, reasonable expedience, and faithfulness the thing agreed to be done, and the negligent failure to observe any of these conditions is a tort, as well as a breach of contract. Under such circumstances, the general rule is that the plaintiff may elect which to pursue.'"

"Since the claim of Lewis was grounded on duress, he had a right to sue in a tort action as plaintiff in his own behalf."

There is no evidence in the record of the kind of crane that Smith "proposed" to deliver to King. Smith contracted to deliver to King the crane as "specified". King was under a contract, with penalty provisions, to build the atomic energy plant at once. There was no legal excuse or reason for Smith to refuse to deliver the crane as "specified". If Smith underbid on the crane, it should have taken the loss voluntarily, or secured an amendment of the contract with the Atomic Energy Commission. Of course, the trial court found that the contract could not be amended. Smith created a duress upon King by its actions in refusing to deliver the crane as "specified". Points 6, 7, 8, and 9 are sustained.

The trial court awarded the appellant an attorney's fee in the sum of $750. The appellee did not raise the point of error as to the attorney's fee. Under the holding of the Supreme Court in Langdeau v. Bouknight, Tex., 344 S.W.2d 435, the suit being based upon a contract, such attorney's fees could not be allowed. The reversal of the trial court's judgment automatically reverses the judgment for the attorney's fee.

Under the record in this case, King was forced by duress to sign the contract dated January 8, 1957, and is not bound thereby. Under the pleadings and the evidence in the case, King is entitled to a judgment in the sum of $9,446.50 against Smith.

It is so ordered.

FANNING, J., concurs.

FANNING, Justice (concurring).

Appellant presents 9 points on appeal wherein its contends to the effect that (1) appellant was entitled to judgment on its cross-action under the trial court's findings, and (2) under the undisputed evidence, (3) that there was no evidence to support the trial court's conclusion of law that appellant agreed to and did abandon and rescind the oral contract of December 6, 1956, and (4) that such conclusion of law was not supported by a preponderance of the evidence, that (5) under certain stated undisputed facts the trial court erred in not finding that appellant was not compelled by duress to enter into a new contract, that (6) under certain stated undisputed evidence the trial court erred in holding that appellee and appellant agreed to and did abandon and rescind the oral contract, that (7) under certain stated undisputed evidence the trial court erred in holding that the oral contract of December 6, 1956, was extinguished and that the written contract was substituted therefor; that (8) under certain undisputed evidence the trial court erred in holding that by the signing of the written agreement there was effected a novation whereby the oral contract was extinguished and a new valid and binding contract was created, and that (9) the parties having entered into a valid oral contract on Dec. 6, 1956, for the sale and purchase of the crane specified, for $16,691.00, there was no consideration for the later written agreement for appellant to pay appellee the sum of $30,750.00 for the crane.

Appellant in the "Conclusion and Prayer" portion of its brief has briefly stated its main contentions, and we quote in part therefrom as follows:

"* * * In effect the court found:

"1. Smith Electric was obligated under the *oral* contract to deliver the crane required by the specifications for $16,691.00.

"2. Smith Electric *refused* to do so.

"3. King Construction Company *insisted* that Smith Electric deliver the crane for the price agreed upon.

"4. King Construction Company couldn't get the crane from anyone

else at any price within the time allowed.

"5. If King Construction Company had defaulted on its contract with the Atomic Energy Commission, King could have recovered of Smith Electric at least the difference between $16,691.00 and the reasonable cost incurred by King in purchasing the crane elsewhere.

"6. King Construction Company signed the new contract because it *knew* Smith Electric would *not live* up to its obligations under the oral contract.

"7. By reason of 'fear of economic loss' King Construction Company signed the new contract.

"From these facts the Court concluded that the written contract extinguished the oral contract and that King Construction Company *agreed* to *abandon* and *rescind,* the *oral contract.*

"Appellant submits three propositions:

"1. Under the Findings of Fact as made by the court, the court was in error in its Conclusions of Law.

"2. Bearing in mind that the *burden* of proving novation *was on appellee,* who introduced *not one word* of testimony in proof of *one essential* element —*mutual consent,* appellant submits that the trial court was in error in its Conclusions of Law; and

"3. The undisputed evidence, and the *admissions* of the appellee, showing that King Construction Co. signed the contract for the purpose of persuading Smith Electric to perform an existing obligation, there was no consideration for the new contract."

It is my view that point 9, concerning the lack of consideration for the new contract, is especially well taken in view of the rec-ord in the case and in view of the trial court's fact finding No. 62, reading as follows:

"62. None of the provisions in the written contract of W. M. Smith Electric Company, as finally prepared by Smith Electric and signed by the representative of King Construction Company, furnished an inducement or consideration to King Construction Company to agree to pay W. M. Smith Electric Company the difference between the price of $16,691.00, as originally agreed upon, and the new price of $30,750.00, as set out in the written agreement."

The rule applicable to the fact situation here involved with reference to the lack of consideration for the new contract, is stated by Justice Norvell in DePuy v. Lone Star Dredging Co., Tex.Civ.App., 162 S.W. 2d 161, 165, wr. ref., w. o. m., as follows:

"Contracts for additional compensation for doing that which one is contractually obligated to do are discussed in the well considered case of Blakeslee v. Board of Water Commissioners of City of Hartford, 106 Conn. 642, 139 A. 106, 111, 55 A.L.R. 1319, wherein it is pointed out that such contracts are generally held unenforcible for the reason 'that broadly to admit the power of a contractor to *exact additional compensation* by refusing to continue performance would *afford too many opportunities* for exactions approaching very near to extortion.' " (Emphasis added.)

Also in this connection see the following authorities: 13 Tex.Jur.2d 203; Jones v. Risley, 91 Tex. 1, 32 S.W. 1027; Stone v. Morrison & Powers, Tex.Com.App., 298 S. W. 538; Barreda v. Craig, Thompson & Jeffries, Tex.Com.App., 222 S.W. 177.

"Business Compulsion" is a species of duress clothed in modern dress. In this connection see 17A Am.Jur. 564, Sec. 7, wherein it is stated in part as follows:

"§ 7. Doctrine of Business or Economic Compulsion. There is no doubt that the early common-law doctrine of duress has gradually expanded and broken through its original limitations, with the result that many states have adopted the modern doctrine of 'business compulsion' or what is sometimes referred to as 'economic duress or compulsion.' This doctrine has been regarded by some of the courts as being different from duress, and in the sense that it is a relaxation of the early common-law rule this is true. Yet, broadly speaking, 'business compulsion' is a species of duress, not the common-law duress, to be sure, but duress clothed in modern dress.

"It seems to be established as a general rule, at least in this country, that the payment of money or the making of a contract may be under such circumstances of business necessity or compulsion as will render the same involuntary and entitle the party so coerced to recover the money paid, or excuse him from performing the contract."

It is my further view that appellant signed the new contract under "business compulsion", a species of duress clothed in modern dress, and that the new contract was not a true novation, inasmuch as the essential element of true voluntary mutual consent was lacking. In this connection see Barreda v. Craig, Thompson & Jeffries, Tex.Com.App., 222 S.W. 177, which contains an excellent discussion of a somewhat analogous matter.

Likewise as hereinbefore stated, there was no real or true consideration for the making of the new contract, and consequently there was no novation for this reason as well, as consideration is also an essential element of novation.

· It is my view that appellant was entitled to judgment on its cross-action under material fact findings made by the trial court as well as under the undisputed evidence in the cause, and that appellant's points should be sustained.

I concur in the reversal of the judgment of the trial court and in the rendition of judgment for appellant on its cross-action against appellee.