**MONTGOMERY INDUSTRIES INTERNATIONAL, INC., Plaintiff-Appellee,**

v.

**THOMAS CONSTRUCTION COMPANY, INC. of Missouri and The Travelers Indemnity Company, Defendants-Appellants.**

**No. 79–1367**
**Summary Calendar.***

United States Court of Appeals,
Fifth Circuit.

June 26, 1980.

Rehearing Denied Aug. 8, 1980.

* Fed.R.App.P. 34(a); 5th Cir. R. 18.

William E. Simmons, Richard W. Miller, F. Phillip Kirwan, Kansas City, Mo., for defendants-appellants.

Homer H. Humphries, Jr., Peter J. Kellogg, Jacksonville, Fla., for plaintiff-appellee.

Before HILL, GARZA and THOMAS A. CLARK, Circuit Judges.

GARZA, Circuit Judge:

This is a diversity of citizenship case involving a dispute between a general contractor and a subcontractor. The dispute concerns the revocability of the subcontractor's bid to the general contractor when the general contractor uses the subcontractor's bid in formulating its own bid to another. Although involving basic principles of contract law, such as, offer, acceptance, and consideration, the reasoning and results of similar cases in various states have not been uniform. Additionally, the law of the state which controls this case, Texas, is not well settled since no definitive ruling concerning this matter has been given from the state's highest court. Absent the availability of a certification procedure to the Texas Supreme Court, we must try to ascertain Texas law and apply it to this case.

### FACTS

The plaintiff-appellee, Montgomery Industries International, Inc., at all relevant times, operated its wholly owned unincorporated division, Trans Vac Systems (Trans Vac). Defendants-appellants are Thomas Construction Company, Inc. (Thomas) and Travelers Indemnity Company (Travelers). This case involves the construction of the

John Sealy Hospital Addition at Galveston, Texas. This hospital project was owned by the University of Texas System (the University). In the latter part of 1973, the University announced plans to construct the hospital and a number of contractors, including Thomas, began to prepare their bids. Trans Vac was in the business of planning, building and installing sophisticated trash disposal systems and received the project plans from a commercial service. The plans contained a number of alternatives on different aspects of the project and the general contractors were required to prepare and submit separate bids based on the alternatives. One of the aspects of construction called for separate bids on alternate pneumatic trash disposal systems. Of these alternate systems, at least three were available only through their designers. Trans Vac was the designer of one of these alternate systems and the project plans specified, by name, that the Trans Vac system be used by the general contractor in preparing one of the alternate choices within his general bid. The project plans also provided that the University would at its sole discretion select the system to be used.

Thomas, in preparing for its bid to the University, solicited bids from many suppliers including Trans Vac. The University had set December 18, 1973, at 2:00 P.M. as the deadline for submission of bids and on that morning Trans Vac telephoned Thomas and submitted its initial bid in the amount of $355,650.00 for the trash conveying system. Trans Vac also informed Thomas that detailed plans of the system would not be provided.[1] Later that day, Trans Vac called and submitted a lower bid to Thomas in the amount of $319,650.00. Within less than an hour of Thomas' bidding deadline, Trans Vac called and submitted an even lower bid in the amount of $287,000.00.[2] Trans Vac also submitted identical bids to

several other general contractors bidding on the project. The bid given to Thomas contained no conditions or reservations nor did it indicate any deviation from the specifications issued by the University. Thomas estimated its own costs in connection with the Trans Vac alternative and submitted its entire bid to the University along with a $1,500,000.00 bid bond, with Travelers as the surety, to assure prompt and proper performance in the event the contract was awarded to it.

On December 18, 1973, at 2:00 P.M., the bids were publicly opened and Thomas was found to be the lowest bidder. The University did not immediately award the contract to Thomas but Thomas telephoned Trans Vac that their bids had been the low ones. On January 7, 1974, Thomas received a letter from Trans Vac which indicated that there existed a deviation from the system bid by Trans Vac and the system called for by the plans. This was the first indication to Thomas that Trans Vac's bid deviated from the plans. On January 10, 1974, the University officially awarded Thomas the general contract which included the Trans Vac alternative trash conveying system.

On January 14, 1974, Trans Vac notified Thomas that certain "concessions" would be required in order for Trans Vac to sign its subcontract. On January 15, 1974, Thomas was informed by Trans Vac that a "mistake"[3], in the approximate amount of $50,000.00, had been made in Trans Vac's bid. Prior to this time, Thomas had no indication that Trans Vac would require either concessions or more money to perform their subcontract. In an attempt to resolve the problems, both Thomas and Trans Vac met with University representatives which resulted in University approval of all of Trans Vac's building concessions. The result of these concessions was to make Trans Vac's

---

1. The trial court found that Trans Vac's general policy was to refrain from submitting detailed plans prior to being awarded a contract in order to prevent disclosure of trade secrets.

2. The trial produced evidence that the practice of initially submitting high bids and then submitting lower bids in the final minutes before

deadline is common among subcontractors in a competitive bidding situation and is done to confuse the competition in the event the subcontractor's bid amounts become known to other bidding subcontractors.

3. The testimony and briefs are silent as to what "mistake", if any, was made.

construction easier and less costly. However, Trans Vac's demands for more money were not resolved and Trans Vac refused to sign and perform its subcontract without an additional amount of $32,500.00 for a subcontract price of $321,000.00. It was clear that Thomas could not increase its contract amount in order to accommodate Trans Vac's increase. At this point, Thomas had three alternatives: (1) refuse the increased price, pursue its legal remedies, and face possible forfeiture of its bid bond due to delays in construction, (2) enter a contract for the next closest alternative trash disposal system at an increased cost in excess of $500,000.00 over Trans Vac's $287,000.00 bid and attempt to persuade the University to accept that alternative, or (3) enter into a contract with Trans Vac at the increased price.

Viewing the latter as the only realistic alternative, Thomas entered into a contract with Trans Vac on February 26, 1974, for the increased amount. The evidence is undisputed that Thomas received nothing for the increased price nor was Trans Vac required to perform differently or give up anything in exchange for the price increase.[4]

All work was performed by Trans Vac to the satisfaction of all concerned, but Thomas refused to pay Trans Vac $32,500.00—the amount of the increase. This resulted in a trial without jury and the Court found that there had been no "meeting of the minds" until the execution of the written contract on February 26, 1974. Alternatively, the Court held that even had a contract existed before February 26, that the contract signed on February 26 was a novation and was binding on the parties. The Court awarded the full $32,500.00 under the contract plus $13,000.00 as attorney's fees.

## PROMISSORY ESTOPPEL

The first issue presented, and if answered in the negative the only issue, is whether or not Trans Vac's bid submission to Thomas and Thomas' use and reliance upon that bid in formulating its bid to the University amounted to a legally binding obligation upon Trans Vac to perform for the price of $287,000.00. Thomas argues that the court below failed to properly consider the consequences of the following facts: Trans Vac was specified by the University's plans as the sole source for the project's trash conveyance system; Trans Vac received the project plans and was fully aware of the system specifications required; Trans Vac submitted a bid to Thomas without any conditions or reservations; Trans Vac submitted the bid knowing Thomas would rely on it in preparing the bid to the University; and Thomas did in fact rely to its detriment on Trans Vac's bid in the bid to the University. Thomas argues that the doctrine of promissory estoppel as applied to the facts operate to bind Trans Vac to perform in accordance with its bid. Thomas contends that, although the bid offer was not met with an unequivocal acceptance by Thomas and therefore the absence of mutual promises failed to provide consideration under traditional contract analysis, Trans Vac should nevertheless be estopped from revoking its bid offer at least until Thomas had an opportunity to accept after the general contract had been awarded.

Although there exists no Texas case "on all fours", Texas law is in accord with the doctrine of promissory estoppel and the Supreme Court, in *Wheeler v. White*, 398 S.W.2d 93 (Tex.1965), has recognized the applicability of Section 90 of the Restatement of Contracts.[5] In *Wheeler*, the Texas Supreme Court applied the doctrine of promissory estoppel to allow a suit for damages sustained from a breach of a financing

---

**4.** The subcontract eventually entered provided for an additional $1,000 to be paid to Trans Vac for additional materials, but the evidence shows that this additional work was for a totally unrelated aspect of work.

**5.** Section 90 of the Restatement of Contracts provides: "A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise."

contract which lacked the requisite interest and installment terms necessary for specific enforcement. "[W]here there is actually no contract the promissory estoppel theory may be invoked, thereby supplying a remedy which will enable the injured party to be compensated for his foreseeable, definite and substantial reliance." 398 S.W.2d at 97. "[T]he vital principle of estoppel is that he who by his language or conduct leads another to do what he would not otherwise have done, shall not subject such person to loss or injury by destroying the expectations upon which he acted." *Trinity Universal Insurance Company v. Ponsford Brothers*, 414 S.W.2d 16, 30 (Tex.Civ.App.— El Paso), *rev'd in part on other grounds*, 423 S.W.2d 571 (Tex.1968). However, without a definitive Texas case concerning this factual setting, Thomas cites many cases from other jurisdictions in support of its position including the leading case of *Drennan v. Star Paving Company*, 51 Cal.2d 409, 333 P.2d 757 (En Banc 1958). In *Drennan* a general contractor, the plaintiff, was preparing a competitive bid on a general construction contract. The general contractor received an oral bid by a subcontractor, the defendant, for a paving work subcontract. The defendant's bid was the lowest one and the plaintiff computed its own bid accordingly. After the bids were opened it was determined that the plaintiff's bid was lowest, but the defendant thereafter claimed a bid mistake and refused to perform the work without additional compensation. The plaintiff contracted with another at a higher price to do the work and then brought suit to recover the increase from the defendant. The plaintiff-general contractor recovered judgment on the basis of promissory estoppel and the California Supreme Court affirmed. The Court, speaking through Justice Traynor, reasoned that:

When plaintiff used defendant's offer in computing his own bid, he bound himself to perform in reliance on defendant's terms. Though defendant did not bargain for this use of its bid neither did defendant make it idly, indifferent to whether it would be used or not. On the contrary, it is reasonable to suppose that defendant submitted its bid to obtain the subcontract. It was bound to realize the substantial possibility that its bid would be the lowest, and that it would be included by plaintiff in his bid. It was to its own interest that the contractor be awarded the general contract; the lower the subcontract bid, the lower the general contractor's bid was likely to be and the greater the chance of acceptance and hence the greater defendant's chance of getting the paving subcontract. Defendant had reason not only to expect plaintiff to rely on its bid but to want him to. Clearly defendant had a stake in plaintiff's reliance on its bid. Given this interest and the fact that plaintiff is bound by his own bid, it is only fair that plaintiff should have at least an opportunity to accept defendant's bid after the general contract has been awarded to him. 333 P.2d at 760.

The Court rejected the claim of bid mistake as a defense and stated:

Plaintiff, however, had no reason to know that defendant had made a mistake in submitting its bid. . . . He committed himself to performing the main contract in reliance on defendant's figures. Under these circumstances defendant's mistake, far from relieving it of its obligation, constitutes an additional reason for enforcing it, for it misled plaintiff as to the cost of doing the paving. . . .
It presented its bid with knowledge of the substantial possibility that it would be used by plaintiff; it could foresee the harm that would ensue from an erroneous underestimate of the cost. Moreover, it was motivated by its own business interest. . . . As between the subcontractor who made the bid and the general contractor who reasonably relied on it, the loss resulting from the mistake should fall on the party who caused it. 333 P.2d 761.

 In response, Trans Vac's first meritorious argument contests Thomas' raising the theory of promissory estoppel on appeal. Trans Vac contends that the pleadings and trial evidence failed to specifically point to

promissory estoppel as a method for enforcement of the December 18 bid offer. While we acknowledge the fact that procedure generally must conform to Federal rules in a diversity case, we must also recognize that it is a matter of substantive law as to whether or not *the facts* constitute circumstances creating an estoppel. Here, we find the facts plead and introduced into evidence were sufficient to raise the issue in the court below. *See "Moore" Burger, Inc. v. Phillips Petroleum Company*, 492 S.W.2d 934 (Tex.1972).

■ Next, Trans Vac argues that, even if promissory estoppel is properly present, the facts do not justify its application. Trans Vac points to the fact that it communicated to Thomas, at the time of its bid, that it would not submit a detailed system description, as required by the architects, and that therefore Thomas could not be certain as to what Trans Vac was bidding upon and, without such certainty, Trans Vac's bid could not be expected to induce reliance by Thomas nor could Thomas justifiably rely upon the bid. We find this argument unconvincing. First of all, Trans Vac ignores the fact that they *also* had the plans for the project. The fact that Trans Vac withheld its plans from Thomas is entirely consistent with the trial court's findings that Trans Vac chose to protect its trade secrets. Any contrary conclusion would ignore the well established rule that an offeror is responsible for what the offeree should reasonably interpret the offer to mean. To accept Trans Vac's position, that Thomas should not have relied on their bid, would defeat the entire purpose of such bids as they are used in the commercial world. We therefore hold that Trans Vac is estopped from denying Thomas reasonable time to accept its bid offer.

## NOVATION

■ Trans Vac argues that, even if its bid of December 18 was binding upon it, the contract of February 26, 1974 was a novation of the prior contract and therefore the additional compensation, as provided in the latter contract, should be recoverable.

Thomas counters that, in order to establish novation, Trans Vac, under Texas law, had the burden to plead and prove: (1) A previous valid obligation; (2) the agreement of all the parties; (3) the extinguishment of the old contract; (4) the validity of the new contract; and (5) consideration for the new contract. *Newitt v. Camden Drilling Company*, 552 S.W.2d 928 (Tex.Civ.App.—Corpus Christi 1977, *no writ*); *Hidalgo County v. Pate*, 443 S.W.2d 80 (Tex.Civ.App.—Corpus Christi 1969, *writ ref'd n. r. e.*); *Crossland v. Nelson Auction Service, Inc.*, 424 S.W.2d 318 (Tex.Civ.App.—Amarillo 1967, *writ ref'd n. r. e.*); *McKinney v. Flato Brothers, Inc.*, 397 S.W.2d 525 (Tex.Civ.App.—Corpus Christi 1965, *no writ*); *Crazy Water Company v. Baptist Foundation of Texas*, 268 S.W.2d 776 (Tex.Civ.App.—Dallas 1954, *writ ref'd n. r. e.*).

Basically, Thomas contends that the evidence failed to show and is contrary to any voluntary abandonment of the original agreement by the general contractor. Furthermore, Thomas contends there was absolutely no new consideration to support the February 26 contract. In support of these contentions, Thomas argues the application of novation is clearly precluded by *King Construction Company v. W. M. Smith Electric Company*, 350 S.W.2d 940 (Tex.Civ.App.—Texarkana 1961, *writ ref'd n. r. e.*).

In *King*, the plaintiff, King Construction Company (King), a general contractor, was preparing a bid on a construction project for the Atomic Energy Commission (AEC). The project plans "specified" that an electric overhead crane be used in the construction. The defendant, Smith Electric Company (Smith), submitted a bid for the sale of the "specified" crane for the amount of $16,691.00. Smith knew that the crane it proposed to sell to King would not meet the specifications required by the AEC but it did not inform King in its bid. King prepared and submitted its general bid based on the crane cost as quoted by Smith. King was awarded the construction contract and entered into an oral agreement with Smith to purchase the crane. A few days later Smith informed King that it would not sell

for the original amount claiming the crane would not conform to specifications. King attempted to locate another crane but discovered that Smith was the sole source of the crane which would meet AEC approval. King, faced with contractual penalties for delays in construction, entered into a written contract with Smith for the crane in the amount of $30,750.00. After delivery of the crane, King refused to pay the full price and the trial of the case resulted in a favorable finding for Smith. The trial court held that the written contract was a novation and found that fear of economic loss did not amount to duress sufficient to vitiate the contract. The Court of Civil Appeals reversed and rendered in favor of King. The Court held that a contract "can not be novated without absolute agreement on the part of both parties." 350 S.W.2d at 942. "It seems that Smith took an undue advantage of King in refusing to deliver the crane "specified" for the price of $16,691.00. As a result thereof, King was at a loss. It could not acquire the crane elsewhere, and actually it was compelled by virtue of fear of economic loss (a duress), to enter into the signed contract." *Id.* at 942. After finding, as a matter of law, a lack of consideration to support the new contract, the Court stated, "There was no legal excuse or reason for Smith to refuse to deliver the crane as "specified". If Smith had underbid on the crane, it should have taken the loss voluntarily, or secured an amendment of the contract with the Atomic Energy Commission." *Id.* at 945.

Trans Vac argues that this case is distinguishable from *King* in that here the contract of February 26 contained an integration clause superceding all prior negotiations or agreements of the parties. Trans Vac's argument overlooks the fact that the duress and lack of consideration precluded the consummation of a contract at all. The integration clause would operate only in the event of a valid contract between the parties. All of Trans Vac's other arguments in support of the February 26 contract are without merit. Finding no reason to distinguish this case from *King*, we find that the contract of February 26, 1974 was not a novation.

## GENERAL CONCLUSION

 In Texas, a subcontractor who submits a bid offer to a general contractor, knowing that the general contractor is going to rely on its bid in submitting the general bid, is bound unless it is clearly shown that the subcontractor's bid offer was not final.

REVERSED for entry of an appropriate judgment for defendants by the court below in accordance with this opinion.