**THOMAS CONSTRUCTION COMPANY, INC. OF MISSOURI, Plaintiff-Appellant Cross Appellee,**

v.

**KELSO MARINE, INC., d/b/a W. A. Kelso Building Material Company, Defendant-Third Party Plaintiff-Appellee Cross Appellant,**

v.

**The TRAVELERS INDEMNITY COMPANY, Third Party Defendant-Appellant Cross Appellee.**

No. 79–2325
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.

March 9, 1981.

Margolin & Kirman, Kansas City, Mo., for Travelers Indemnity Co.

Miller, Simmons & Moore, Richard W. Miller, Jeffrey B. Rosen, Kansas City, Mo., for Thomas Const. Co.

Charles M. Jordan, Hertz, Schulz, Schmidt & Jordan, P. C., Galveston, Tex., for defendant-third party plaintiff-appellee-cross-appellant.

Before GODBOLD, Chief Judge, REAVLEY and ANDERSON, Circuit Judges.

R. LANIER ANDERSON, III, Circuit Judge:

This case arises out of a construction project which was also implicated in our earlier opinion in *Montgomery Industries International, Inc. v. Thomas Construction Co.*, 620 F.2d 91 (5th Cir. 1980). The issues in that case and in the instant case are similar. For the reasons explained below, we conclude that our opinion in *Montgomery* controls this case.

Appellant Thomas Construction Co., Inc. is a general contractor. Appellee-cross-appellant Kelso Marine, Inc. is a ready-mix concrete supplier on Galveston Island, Texas. In late 1973, Thomas decided to bid on the John Sealy Hospital addition in Galveston, Texas, a project to be built for the University of Texas System. Thomas invited numerous suppliers, including Kelso, to submit proposals. Kelso submitted an oral proposal to Thomas on December 10, 1973, proposing to furnish masonry material for the John Sealy Hospital addition at specified prices. On December 11, 1973, Kelso submitted an oral proposal to Thomas proposing to furnish the ready-mix concrete for the hospital job at specified prices. On December 14, 1973, Kelso, by letter to Thomas, confirmed the oral proposal made December 11, 1973, with respect to ready-mix concrete, etc., but did not cover the masonry material which was the subject matter of the oral proposal of December 10, 1973.

On January 10, 1974, Thomas was awarded the hospital project contract. Shortly thereafter, Patrick Howard Thomas of Thomas Construction Co., Inc. received a call from Dan Smith of Kelso. The district

court found that at the time of this telephone conference, "Thomas and Kelso did cement a binding and enforceable contract" which provided that Kelso would furnish the masonry material and ready-mix concrete at prices stated in the earlier oral proposals.

At the end of March, 1974, Kelso gave notice to Thomas that it would not remain committed to the prices it had agreed upon. The parties negotiated, and eventually on September 26, 1974, executed a purchase order, No. 1168–50, covering all the ready-mix concrete, but not the masonry material, for the hospital job, at prices above those previously agreed upon. Thomas subsequently sued Kelso for breach of contract.

We consider these issues on appeal: (1) whether the district court erred in its conclusion that a valid oral contract existed covering both ready-mix concrete and masonry material as of January, 1974; (2) whether the district court erred in its conclusion that the oral contract covering masonry material was not superseded by a written novation; (3) whether the district court erred in its conclusion that the oral contract covering ready-mix concrete items *was* superseded by a written novation in September, 1974; and (4) whether Thomas is entitled to an award of attorney's fees from Kelso because of Kelso's alleged bad faith. With respect to issue number 1, we affirm the district court's determination that a valid oral contract, covering both ready-mix concrete and masonry material, existed between the parties as of January 10, 1974. *Accord Montgomery v. Thomas Construction Co.*, 620 F.2d 91 (5th Cir. 1980). With respect to issue number 2, we also affirm the district court's determination that the oral contract relating to masonry material was not replaced by a written novation. Like the district court, we decline to infer the existence of the elements of novation on the basis of the November 18 and December 31, 1974, letters from Dan Smith to Ralph Whitman. No

further discussion is necessary of issue number 1 and issue number 2. With respect to issue number 3, we reverse the district court, and set out our reasons in the balance of this opinion. We vacate and remand with respect to issue number 4.

With respect to issue number 3, we hold that our *Montgomery* opinion requires reversal of the district court determination that the purchase order executed on September 26, 1976, was a novation of the prior contract relating to ready-mix concrete. In *Montgomery*, defendant Trans Vac (a wholly-owned unincorporated division of Montgomery Industries International, Inc.) submitted a bid to Thomas [1] for a trash disposal system in connection with the same John Sealy Hospital addition project involved in the instant case. Trans Vac submitted its bid of $287,000 to Thomas on December 18, 1973, just before Thomas' bidding deadline. On January 7, 1974, Trans Vac first informed Thomas that its bid deviated from the plans. On January 10, 1974, Thomas was awarded the general contract which included the Trans Vac trash conveying system. Trans Vac thereafter informed Thomas that a mistake had been made in its bid and refused to sign and perform its subcontract unless $32,500 were added to its subcontract bid of $287,000. We found that Thomas, which could not increase its general contract amount to provide for Trans Vac's increase, had three alternatives at that point:

(1) refuse the increased price, pursue its legal remedies, and face possible forfeiture of its bid bond due to delays in construction, (2) enter a contract for the next closest alternative trash disposal system at an increased cost in excess of $500,000.00 over Trans Vac's $287,000.00 bid and attempt to persuade the University to accept that alternative, or (3) enter into a contract with Trans Vac at the increased price.

620 F.2d 91, 94 (5th Cir. 1980). Thomas chose the last alternative and executed a

1. The Thomas Construction Company in the cited case is also the appellant in the instant case.

written agreement with Trans Vac on February 26, 1974. After the work was performed by Trans Vac, however, Thomas refused to pay the amount of the increase and Trans Vac sued. The district court held that there was no contract until the written contract of February 26, 1974, or, alternatively, that the February 26, 1974, agreement was a novation. Relying on *King Construction Co. v. W.M. Smith Electric Co.*, 350 S.W.2d 940 (Tex.Civ.App. 1961 *writ ref'd n.r.e.*), this court reversed. We found, first, that Trans Vac's bid submission to Thomas and Thomas' reliance upon that bid in formulating its bid to the University amounted to a legally binding obligation upon Trans Vac to perform for the price of $287,000 under the doctrine of promissory estoppel; and second that the agreement of February 26, 1974, was not a novation because "[economic] duress and lack of consideration precluded the consummation of a contract at all [on February 26, 1974]."

In the instant case, Thomas was faced with a similar demand for a price increase. Thomas again had three alternatives: (1) refuse the increased price, pursue its legal remedies, and face possible forfeiture of its bid bond due to delays in construction; (2) attempt to set up its own batch plant to provide the concrete needed for the job; or (3) enter into a contract with Kelso at the increased price. As it did with respect to its dispute with Trans Vac, Thomas chose the alternative of acceding to the subcontractor's demand for a price increase and executed a written agreement with Kelso in September, 1974.

■■■ We need not reach the question whether there was consideration for the alleged novation executed by Thomas and Kelso in September of 1974. We find that,

under the principles of our decision in *Montgomery*, economic duress precluded consummation of the alleged novation. The parties have been given the opportunity to distinguish the instant case from *Montgomery*. We have considered their arguments and the reasoning of the district court on the question of economic duress. We find the principles of *Montgomery* controlling.[2] Because Thomas was compelled by fear of economic loss to enter into the September 26, 1974, written agreement, this agreement was the product of economic duress and it therefore cannot constitute a novation of the prior agreement.

The district court judge defined novation as follows:

> Novation is commonly defined as the creation of a new obligation in the place of an old one, either by the substitution of a new agreement between the same parties or by substitution of a new party to the agreement, accomplished by the mutual consent and agreement of the parties with the intent to extinguish the old obligation. 41 Tex.Jur.2d Novation § 1.

Memorandum Opinion Concerning Post Judgment Motions, Record on Appeal, vol. II at 384–5. He described the elements of novation under Texas law:

> To constitute a valid novation four essential elements must be proven: a previous valid obligation; a mutual agreement of all parties to acceptance of a new contract; a substitution of the new contract for the old, effecting its estinguishment [sic]; and a valid new agreement. 41 Tex.Jur.2d, Novation § 7, pg. 554. *Utay v. Urbish*, 433 S.W.2d 905, 909 (Tex.Civ. App.1968) [*writ ref'd n.r.e.*].

2. Kelso attempts to distinguish *Montgomery* by asserting that Thomas was not coerced because Kelso continued to deliver concrete pending negotiations between the parties on Kelso's demand for a price concession whereas in *Montgomery* and in the case on which it relies, *King Construction Co. v. Smith Electric Co.*, 350 S.W.2d 940 (Tex.Civ.App.1961 *writ ref'd n.r.e.*), there was a refusal to deliver. We remain unconvinced that Kelso has sufficiently distinguished *Montgomery* and *King*. Kelso's insis-

tence on a price increase carries an obvious threat of nondelivery; otherwise, Thomas would surely have simply ignored Kelso's attempts to renegotiate a better price. Although the district court found no evidence that Kelso had actually *told* Thomas that it would cease delivering unless the concessions were made, we do not think it is incumbent upon Thomas to produce evidence to bolster the inference of such a obvious threat.

Memorandum Opinion Concerning Post Judgment Motions, Record on Appeal, vol. II at 388.

Thomas argues that it was compelled to enter into the September 26, 1974, agreement because Kelso was the sole source of supply for ready-mix concrete on Galveston Island, i. e., because there was no subcontractor other than Kelso which could supply Thomas' needs for the project and it would have been economically prohibitive for Thomas to set up its own batch plant. The absence of alternatives amounts to economic duress, Thomas argues. Our decision in *Montgomery* makes it clear that to avoid a claim of economic duress in this case, it must appear not only that alternatives to Kelso concrete existed but also that they were *economically feasible*.[3]

The district court's determination that "Thomas had numerous alternatives which it could have adopted" (Memorandum Opinion Concerning Post Judgment Motions, Record on Appeal, vol. II at 389) is clearly erroneous to the extent that it is viewed as a finding that Thomas had numerous alternative sources of concrete.[4] The record shows, and the parties concede, that the only alternative source of concrete available to Thomas would require that Thomas set up its own batch plant.[5] Patrick Thomas testified that Thomas investigated the possibility of setting up its own batch plant after Kelso demanded price increases, but found that it would be economically prohibitive for Thomas to do so. (Record on Appeal, vol. I at 97–98). This conclusion is not

3. In *Montgomery*, it appeared that while Thomas had alternative sources for the waste disposal system, the price of the next closest alternative was in excess of $500,000 over the subcontractor's bid. We declined in *Montgomery* to hold that the existence of such an economically unfeasible alternative vitiated a claim of economic duress.

4. In his Findings of Fact Based on Evidence, the district judge found (Record on Appeal, vol. II at 370–71), "[t]he predominate ready-mix supplier on Galveston Island for many years has been Kelso Marine, Inc. d/b/a W. A. Kelso Building Materials Company (hereinafter "Kelso"). While Kelso has had competition from time to time, that competition generally has not been particularly effective. During the period from 1973 until the date of trial, it was readily foreseeable to any general contractor wishing to bid a large job on Galveston Island that the only supplier of ready-mix concrete on Galveston Island might be Kelso. On the other hand, this set of facts did not mean that Kelso was entirely without competition. If a job were large enough, and the general contractor had access to sufficiently skilled personnel, it might be economically feasible in any particularly large project for the general contractor to set up its own ready-mix operation, thus bypassing Kelso." Memorandum Opinion Concerning Post Judgment Motions, Record on Appeal, vol. II at 370–71. This finding appears to contradict any finding that Thomas had "numerous alternatives." We are therefore hesitant to assume that the district court intended to make a finding that numerous alternative sources of concrete existed. One "alternative" which the district court may have had in mind is indicated by its statement: "Thomas could have set up its own ready-mix plant; and even if that

caused economic loss, could have simply kept track of the economic loss and sued Kelso for damages." Memorandum Opinion Concerning Post Judgment Motions, Record on Appeal, vol. II at 387. Our opinion in *Montgomery*, however, makes it unnecessary for Thomas to enforce its rights under the January, 1974, contract in this manner. If, as it appears in this case, Thomas' only alternative is economically unfeasible, then under *Montgomery* Thomas had no alternative at all. We do not think that the district court's statement that "it might be economically feasible . . . for the general contractor to set up its own ready-mix operation" obviates the need for Kelso to demonstrate an economically feasible alternative in order to overcome Thomas' claim of economic duress due to the absence of economically feasible alternatives.

5. There is testimony in the record suggesting that it would theoretically have been possible for concrete suppliers not on Galveston Island to supply Thomas' needs for the John Sealy project. These suggested "alternatives," however, are merely speculative. Leo Lakovich, vice president of Kelso, testified in deposition that none of Kelso's competitors had ready-mix plants close enough to the site of the John Sealy Hospital. Lakovich deposition at 23. When asked what alternatives Thomas had to buying from Kelso or setting up its own batch plant, Mr. Lakovich replied that Thomas could deal with another supplier. But when asked to specify an alternative supplier available to Thomas, he replied, "[a]nybody he chooses, you know, that wanted to bid the job and come in here and set a plant up." Lakovich deposition at 119.

disputed.[6] Accordingly, we conclude that, because Thomas had no economically feasible alternative to Kelso concrete, it was compelled by economic duress to enter into the September 26, 1974, agreement; that the September agreement is therefore invalid; and that there has been no novation of the January contract. Thomas may thus enforce its rights under the January contract.

Finally, with respect to issue number 4, the attorney's fees issue, we vacate and remand for reconsideration by the district court.

REVERSED AND REMANDED.

6. In fact, Kelso's vice president, Leo Lakovich, testified that the Kelso concrete was financially the "best deal" available to Thomas. Lakovich deposition at 118, 136.